103 Cal.Rptr.2d 355 (2001)
86 Cal.App.4th 61
Charles F. MAGILL et al., Petitioners,
v.
The SUPERIOR COURT of the County of Madera et al., Respondents.
The People ex rel. Bill Lockyer, as Attorney General, etc., Real Party in Interest.
No. F035276.
Court of Appeal, Fifth District.
January 10, 2001.
As Modified on Denial of Rehearing January 29, 2001.
Review Denied April 25, 2001.[*]
*363 Colin J. Kooyumjian, Charles F. Magill, in propria persona, and Timothy V. Magill, for Petitioners.
No appearance on behalf of Respondents.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Carlos A. Martinez and Catherine G. Tennant, Deputy Attorneys General, for Real Party in Interest.

OPINION
ARDAIZ, P.J.
This case involves several issues directly bearing on the attorney-client privilege, including what constitutes a privileged communication, and what constitutes appropriate action by a special master conducting a search of an attorney's office. At the outset we set forth the nature of the issues and our conclusions.
If an attorney takes a photograph of an object that is itself not privileged, is that photograph privileged or may it become privileged because it may lead to disclosure of a client's identity? Under the unusual circumstances of this case, we conclude the attorney-client privilege does not apply.
This case further presents a textbook example of how to execute a search warrant and violate the protections inherent in the special master statute. Indeed, the conduct of the parties hereinthe special master, the law enforcement officers, the district attorney's office, and the Attorney Generaldefeated the very purpose of the statutory scheme that protects the confidentiality of materials prior to a final judicial determination of the application of the attorney-client privilege. In the interest of judicial economy, however, we will decline to initiate sanction proceedings because the costs required to make such findings would outweigh the amount actually imposed. (Guthrey v. State of California (1998) 63 Cal.App.4th 1108, 1126-1127, 75 Cal.Rptr.2d 27.) Instead, we will let the record of this case speak for itself as a rebuke to the parties herein, and as an admonishment to future parties to refrain from such conduct.

STATEMENT OF THE CASE
On March 10, 2000, California Highway Patrol Officer Tom Shepard filed an affidavit in Madera County Superior Court for the issuance of search warrants for the residences and vehicles of petitioners Charles Magill and Myrl Stebens, and for the seizure of all photographs and videotapes of a white Ford cargo van and blue flatbed trailer. On the same day, the trial court issued search warrant Nos. 1289 and 1290, and appointed Steven Mortimer as special master for execution of the search warrants pursuant to Penal Code section 1524.
On March 15, 2000, Special Master Mortimer, accompanied by officers from the California Highway Patrol, executed the search warrants and seized a file from the residence of Myrl Stebens. The file was sealed pending a determination of petitioners' objections that the contents were confidential pursuant to the attorney-client privilege.
*364 On March 20 and 23, 2000, the trial court conducted a hearing pursuant to Penal Code section 1524 to determine whether the contents of the file seized from Stebens's residence were confidential pursuant to the attorney-client privilege.
On March 23, 2000, the court found the videotape and photographs seized from Stebens's residence were not protected by the attorney-client privilege, but the balance of the documents and items in the seized file were confidential and protected from disclosure by the attorney-client privilege. The court ordered the entire file to remain sealed, and stayed the disclosure order pending petitioners' decision to seek further review of the matter.
On March 27, 2000, petitioners Charles Magill, Myrl Stebens, and John Doe filed a petition for writ of mandamus and request for appeal with this court seeking review of the trial court's ruling as to the applicability of the attorney-client privilege to prevent disclosure of the contents of the file seized from Stebens's residence. Petitioners also requested this court to issue an immediate stay of the trial court's ruling.
On March 28, 2000, this court filed an order staying the trial court's disclosure ruling, and ordered the balance of the seized documents, as well as original and copies of notations made concerning said seized materials, to remain sealed pending further order of this court. This court also ordered all parties and their agents to maintain the confidentiality of the information gleaned from the seized documents pending further order of this court, and requested respondents file an informal response.
On April 24, 2000, Real Party in Interest, the People of the State of California (hereinafter Real Party), filed an informal response, supported by exhibits and declarations.
On May 4, 2000, this court ordered that an order to show cause should issue as to why the relief prayed for in the petition for writ of mandamus should not be granted, returnable before this court on October 13, 2000.
On May 16, 2000, this court filed the order to show cause.
On June 9, 2000, Real Party filed a return to the petition for writ of mandamus.
On June 13, 2000, this court denied Real Party's motion to shorten time.
On August 4, 2000, petitioners filed a reply to the return, and requested this court order the informal response and return be placed under seal. Petitioners also requested this court to sanction Real Party for various violations of this court's order which sealed the file pending a determination of the matter.
On August 25, 2000, this court deferred ruling on the sanctions and other relief sought by petitioners pending a determination of the issues raised in the petition for writ of mandamus, or upon further order of this court.
On September 7, 2000, this court ordered the trial court to transfer the sealed file to this court, and to maintain its sealed condition pending further order of this court.

INTRODUCTION
An attorney was retained by a client and asked to investigate the client's possible involvement in a fatal hit-and-run vehicular accident. The client asked the attorney to take photographs of his vehicle, publish the photographs to law enforcement investigators, and find out if they were looking for his vehicle. The client authorized his attorney to make limited disclosures to the investigators, but to keep his identity confidential.
The attorney published the photographs to the investigators but redacted the photographs to prevent disclosure of the vehicle's license plate number. The investigators demanded to speak with the client, but the client refused and continued to *365 instruct the attorney to maintain his anonymity. The investigators then demanded unredacted copies of the photographs in order to determine the vehicle's license plate number and discover the client's identity. The attorney refused to turn over the photographs and a videotape which also depicted the vehicle.
The investigators obtained a search warrant and seized the attorney's file which contained the unredacted photographs, the videotape, and other items which disclosed the client's identity. The attorney asserted the items in his file were confidential communications and independently protected from disclosure by the attorneyclient privilege. The attorney also claimed the client's identity was protected by the attorney-client privilege because disclosure of his identity would lead to criminal investigation or prosecution for the very matter the client retained the attorney. The trial court rejected the attorney's arguments and found the videotape and the unredacted photographs were not privileged materials.
The attorney has filed the instant mandamus proceeding with this court and reasserts his arguments regarding the applicability of the attorney-client privilege. He also contends the contents of the file were improperly disclosed to law enforcement investigators prior to a final judicial determination of the applicability of the attorney-client privilege.
Our factual discussion will be divided into part I, regarding the investigation and the proceedings involving the search warrant and seizure of the attorney's file, and part II, regarding the proceedings herein and the manner in which certain materials in the file were prematurely disclosed.
Our legal analysis will begin with a determination of the appropriate standard of review in this mandamus proceeding. We will discuss the attorney-client privilege and the work product rule, and determine whether the videotape and unredacted photographs are independently protected from disclosure by either of these rules. We will also determine whether a client's identity is a confidential communication within the meaning of the attorney-client privilege, and whether the videotape and unredacted photographs are protected from disclosure because such items would identify the client. Finally, we will determine whether any of the items within the file were improperly disclosed to law enforcement officers prior to a final judicial determination of the applicability of the privilege.
As stated above, we will find the photographs and videotape are not protected from disclosure by the attorney-client privilege. We will also find the special master improperly executed the search warrant and disclosed the contents of the file prior to any judicial determination of petitioners' claim of privilege.

PARTI
THE INVESTIGATION AND THE SEARCH WARRANT PROCEEDINGS

The accident
At 6:30 p.m. on February 15, 2000, a vehicular accident occurred on Highway 41, north of Road 406 in Madera County. There were two fatalities, and the accident was caused by a "hit-and-run" driver. California Highway Patrol (CHP) Officers Tom Shepard and Paul Curtin were assigned to investigate the accident.[1]
On or about February 18, 2000, petitioner Charles Magill, an attorney licensed to practice in California, was contacted and retained by Mr. and Mrs. John Doe. According to Magill, John Doe gave Magill a *366 newspaper article regarding the fatal vehicular accident which occurred on Highway 41 on February 15, 2000. Magill read the newspaper article and learned the CHP was looking for a particular vehicle that was alleged to have been involved in the accident. The newspaper article described the suspect vehicle as a white van-type vehicle which was pulling a trailer. John Doe asked Magill to photograph a vehicle and a trailer, and publish the photographs to the CHP to determine whether or not they were looking for that type of vehicle. John Doe instructed Magill not to disclose any information about him, and did not give Magill any authority to disclose his identity. John Doe also instructed Magill to assert the attorney-client privilege if anyone tried to discover his identity.
John Doe paid Magill's retainer fee by check. John Doe also gave several documents to Magill, including newspaper articles about the accident and various contracts from a rental company. Magill created a file for John Doe, and placed all the relevant documents concerning Doe's case in that file.
On or about February 21, 2000, Magill retained Myrl Stebens, a licensed private investigator, to assist in John Doe's case. Magill asked Stebens to contact John Doe and arrange a meeting to photograph a vehicle and a trailer. Magill gave Stebens the entirety of the John Doe file, including all the documents which Doe gave Magill, and instructed Stebens to place the photographs in the file.
On February 21, 2000, Stebens contacted John Doe and made arrangements to meet him at a public parking lot on Blackstone Avenue in Fresno. Stebens took numerous 35-millimeter photographs of the exterior of a white van, from various sides and angles. The van's license plate number was visible in several of the photographs. Stebens did not enter the vehicle, and did not seize any materials from the interior. Stebens did not take possession or control of the white van, and John Doe retained possession and control of the vehicle at all times. Doe also took videotape footage of the white van.
After taking photographs of the white van, John Doe assisted Stebens in locating a blue trailer, which was parked at a rental company lot. Stebens took videotape footage of the blue trailer. Stebens did not take possession or control of the blue trailer, which remained on the premises of the rental company.
Stebens developed the photographs and showed the photographs and videotape to Magill. Stebens also discussed his personal observations of the white van and trailer with Magill. At Magill's direction, Stebens placed the photographs and the videotape in John Doe's file. Stebens's office was located in his residence, and Stebens kept John Doe's file at his residential office. Stebens assured Magill that he would follow his instructions and maintain the confidentiality of all materials in John Doe's file.
According to Magill, he determined that Stebens's investigation revealed that the van was not involved in an accident. "At the request of John Doe, and to eliminate John Doe as a suspect," Magill decided to provide photographs of the van to the CHP.

Magill's contacts with the CHP
After reviewing the matter with Stebens, Magill placed a telephone call to the CHP field office in Fresno. According to Magill, he told an officer that he had photographs "of a van that appeared to fit the description of a van that they were looking for involved with an accident." The officer said that he would forward the information to the investigating officer.
On February 23, 2000, CHP Officer Tom Shepard received a message from another officer that Magill had photographs of a vehicle that was possibly involved in the hit-and-run accident on Highway 41, and that Magill wanted someone to call him about the investigation.
*367 On the morning of February 24, 2000, Officer Shepard called Magill and identified himself as the investigating officer for the February 15, 2000, hit-and-run accident on Highway 41. Shepard said he received information that Magill had photographs of a vehicle possibly involved in the collision. Magill told Officer Shepard that he had photographs "of a vehicle that fit the description of a vehicle that he was investigating, and I wanted him to receive those photographs and to eliminate that vehicle as a possible suspect vehicle."
According to Shepard, Magill also stated he had "photographs of the vehicle he believed I was attempting to locate," but he only knew the details about the accident which had been published in the newspaper. According to Shepard, Magill further stated he had been retained by an individual who owned the vehicle. Shepard asked Magill if the vehicle matched the description of the vehicle involved in the traffic collision, and Magill replied that it did. However, Magill did not state that his client's vehicle was involved in the collision.
According to Shepard, Magill made additional statements regarding his client and the vehicle:
"I asked Mr. Magill if his client was driving the vehicle on Highway 41, in the area of the collision at the time the collision occurred. Mr. Magill said he was. Furthermore, I asked Mr. Magill if his client was towing a blue flatbed trailer at that same time. Mr. Magill said he was. [¶] Mr. Magill told me that he thought this was the vehicle I was looking for; however, he felt I would learn that the collision did not occur as it was described in the newspapers." (Italics added.)
Magill agreed to leave the photographs at a secretarial office that he shared with other attorneys. Magill selected photographs that just showed the passenger side of the vehicle, in order for the officers to determine whether or not it was the vehicle they were looking for. These photographs did not depict the vehicle's license plate number or any indicia of identification.
On the same day, Officers Shepard and Curtin went to the office and collected an envelope marked "CHP." The envelope contained three color photographs of a white Ford cargo van, and appeared to have been taken in a parking lot. A handwritten sign was next to the van, which reflected the photographs were taken by Stebens on February 21, 2000, at 4343 N. Fresno Street. Officer Shepard determined such an address did not exist.
On the afternoon of February 24, 2000, Officer Shepard placed another telephone call to Magill and said that he needed to see the van and the blue trailer. Magill replied that he had additional photographs of the van, but he only had a videotape of the trailer. Officer Shepard asked to see * all photographs and the videotape. Magill said he would make arrangements with his investigator to provide Shepard with the additional photographs, but he was not sure how he could arrange for Shepard to view the videotape. Magill also stated that he would redact the photographs so they would not reflect the vehicle's license plate number. Magill explained that he intended to redact the license plate number because he had been instructed by John Doe to maintain his anonymity.
Officer Shepard also asked to speak with Magill's client. Magill replied that he would convey the request to John Doe, but Magill believed Doe would decline to speak with the officers. Magill stated that he would advise Doe to exercise his right to remain silent, and not to speak with any law enforcement officers unless counsel was present. Magill asked Officer Shepard for copies of the CHP's accident reports. Magill also asked whether the white van depicted in the photographs had been identified by any witnesses to the accident, and whether John Doe was under investigation. Shepard declined to give *368 any details of the investigation or provide any reports.
After speaking with Officer Shepard, Magill contacted his investigator, Stebens, and directed him to prepare copies of the additional photographs of the white van. Magill instructed Stebens to block out the vehicle's license plate number, prepare copies of the redacted photos, and give the redacted copies to Officer Shepard.
Later that same day, Stebens called Officer Shepard and identified himself as Magill's investigator. Stebens stated he would provide Officer Shepard with copies of the additional photographs of the white van, but he had been directed by Magill to cover the vehicle's license plate number on the photographs prior to making the copies. According to Officer Shepard, he told Stebens that blocking the vehicle's license plate number on the copies would be hindering a felony investigation. Stebens replied he was just following Magill's directions. Stebens and Shepard scheduled a meeting for later that day.
Officers Shepard and Curtin met with Stebens that afternoon. Stebens provided the officers with copies of the redacted photographs of the white van. In each of the photographs, the license plate number had been covered prior to the making of the copies. Stebens told the officers that John Doe was extremely scared regarding this incident, and that Magill was researching the Penal Code on his behalf. Officer Shepard asked about the videotape of the trailer. Stebens replied the videotape was at his house.
Officer Shepard also asked Stebens about the location where he took the photographs of the white van. Stebens explained that he mistakenly wrote "Fresno Street" on the placard in the photographs, and the photographs had actually been taken in a parking lot on Blackstone Avenue.
According to Stebens, Officer Shepard was very upset the photographs had been redacted, and asked for additional information about John Doe. Stebens replied such information was confidential and privileged, and directed Shepard to speak with Magill about such matters. Officer Shepard asked Stebens if he knew the location of the vehicle and the trailer. Stebens replied he did not know the location of the vehicle, and he had photographed it in a public place. According to Stebens, Shepard never told him that blocking the license plate number was hindering a felony investigation.
On February 25, 2000, Officer Shepard telephoned Magill and stated he needed to see the van and the trailer. Magill replied he would speak with John Doe and make arrangements for Shepard to see the vehicles.
On February 28, 2000, Officer Shepard again spoke with Magill. He asked to see the van and the trailer, and speak with John Doe. Magill replied he would speak with John Doe about the vehicles, but he had advised Doe not to speak with the investigators regarding this matter. Magill requested a copy of any arrest warrant for John Doe, but Shepard never informed him of the existence of any arrest warrant. Magill again stated that John Doe desired to remain anonymous.

The district attorney's telephone conversation with Magill
On March 2, 2000, Officer Shepard conferred with Madera County Deputy District Attorney Michael Keitz about Magill's client and the redacted photographs. Keitz placed a call to Magill, in Shepard's presence, using the speaker on his telephone. Magill was unaware the call was on a speakerphone. Magill was also unaware that Keitz was tape recording the telephone conversation.
According to the transcript of the tape-recorded conversation, Keitz asked Magill to turn over Doe's vehicle and trailer. Magill stated he was not in possession of the vehicles, but Keitz pointed out that Magill had access to the vehicles because *369 he knew where they were. Magill replied he didn't know where the vehicles were. Keitz disagreed because Magill had the ability to deliver the vehicles to law enforcement. Magill reminded Keitz that he had asked for information about the accident to determine if the CHP was looking for his client's vehicles, but the CHP failed to deliver any reports to him. Magill had told John Doe that it was up to him as to whether he wanted to assist the CHP in their investigation, and whether Doe wanted Magill to deliver the vehicles to the CHP. Magill further stated he had been given "no information or no reason why [Doe] should wish to assist them," and that Magill had a duty to his client as his attorney, to so advise.
Magill asked Keitz to explain "under what basis am I required to deliver" the vehicles to law enforcement. Keitz replied that an attorney had a duty to turn over evidence of a crime to the police. Magill agreed that if he possessed a gun used in a crime, that he would be required to turn it over. However, this matter involved a moving vehicle rather than a gun, and Magill did not have possession of the vehicle. Keitz replied that Magill had access to the vehicle through his client.
Magill informed Keitz that John Doe "contacted me and said they believe that their vehicle, that they have been involv[ed], they, they may be the ones that's looked for by law enforcement." Magill provided the CHP with photographs to determine if the officers were looking for Doe's vehicle. Magill asked Keitz for legal authority which required him to turn over Doe's vehicle to the CHP. Keitz suggested Magill read Penal Code section 135, which required an individual to turn over evidence of a crime to law enforcement. Keitz explained if the vehicle had been involved in the accident, it was then a piece of evidence.[2]
Magill replied that he did not know if Doe's vehicle had been involved in the accident because he did not have any accident reports or information from the CHP regarding the nature of the accident or the suspect vehicle. Magill demanded Keitz provide him with information which reflected Doe's vehicle had been in the accident rather than make blanket statements about his duty to turn over something that might be evidence. Keitz explained he did not have to show any evidence to Magill because "you've made a statement to the [CHP] that this vehicle was in the area, at at [sic] the scene." Magill replied that he did not make that statement, but merely stated his client "wished to know, if this vehicle is the vehicle you're looking for. That's what I told [Officer Shepard]. I made no statements that, that I have any knowledge where that vehicle was at."
At this point in the conversation, Keitz turned to Officer Shepard and asked whether Magill had made such statements. Shepard replied that Magill's assertion was not true. Magill realized Shepard had been listening to his conversation with Keitz. Magill became angry and hung up.
Keitz immediately called back. Magill answered and said, "Don't you ever put me on the phone, on a speaker phone when you have people that are there without informing me of it." Keitz apologized but Magill ended the conversation.

The Search Warrant
After Keitz's telephone conversation with Magill, Officer Shepard decided to obtain a search warrant for information regarding John Doe's vehicle and the trailer. Officer Shepard spent several days conducting an investigation, and determined that both Magill and Stebens used their residences in Fresno as their offices. *370 Shepard did not have any further contact with either Magill or Stebens regarding his requests for the photographs prior to the execution of the search warrant.
On March 10, 2000, Officer Shepard filed an affidavit in Madera County Superior Court in support of his request for search warrants for the residences and the vehicles of petitioners Magill and Stebens, to locate all photographs, negatives, and videotapes of the white van and blue trailer, any and all documents which tended to identify the vehicles in question and their locations, and any information which indicated other locations where it would be reasonable that the items sought in the warrant might be kept. Officer Shepard requested seizure of such evidence, which was expected to reveal the license plate number and full description of the vehicles involved in the fatal collision, and the license information "will reveal the registered owner(s) of those vehicles." Petitioners did not raise any objection before the trial court to the search warrant based on probable cause. Therefore, we are only concerned with the manner of the search as it pertains to the issue of attorney-client privilege.

Appointment of the special master
On March 10, 2000, Madera County Superior Court Judge John DeGroot issued search warrants Nos. 1289 and 1290 for the residences and vehicles of petitioners Magill and Stebens, for all photographs, negatives, and videotapes of the white Ford van and blue flatbed trailer, any and all documents which tended to identify the vehicles and their locations, and any information which might indicate other locations where such items would be kept. Judge DeGroot authorized the seizure of such items pursuant to Penal Code section 1524, and appointed Steven Mortimer as the special master for the execution of the search warrants.
Deputy District Attorney Keitz contacted Mortimer and informed him that he had been appointed as the special master to assist in a search to be conducted by officers from the CHP. Keitz arranged for Mortimer to meet with the officers prior to the execution of the search warrants.

The searches and the inventory receipt
At 10 a.m. on March 15, 2000, Special Master Mortimer met CHP Lieutenant William Leist, Officer Paul Curtin, and two other officers at the CHP field office in Fresno. Mortimer examined the search warrants and was briefed by the officers concerning the materials which were listed for seizure.
Thereafter, Mortimer and the officers traveled to Stebens's residence in Fresno. Stebens opened the door, and Mortimer and the officers entered the residence. Mortimer advised him of the search warrants, the items sought, and his appointment as special master to supervise the search. Stebens produced a manila folder from a filing cabinet and indicated that it contained the items sought in the search warrant. However, Stebens repeatedly stated the contents of the folder were protected by the attorney-client privilege. Mortimer advised Stebens that the contents would be sealed and taken directly to the Madera County Superior Court, and would not be made available to the police until a hearing was held as to his assertion of the privilege. Stebens again asserted the contents were protected by the attorney-client privilege, and gave the closed file to Mortimer.
It is undisputed that Mortimer seized the John Doe file and reviewed the contents in order to fill out an inventory receipt. It is also undisputed that Stebens tried to place a telephone call to Magill during the compilation of the inventory receipt, but he was prevented by the officers and told that he could not make any calls during the execution of the warrant. However, the parties dispute the manner in which Mortimer actually compiled the inventory receipt for the contents of the file.
*371 According to Stebens, Mortimer opened the John Doe file and reviewed the contents. Stebens requested a receipt from Mortimer for the file's contents. Mortimer instructed Officer Curtin to produce and fill out an inventory receipt. Mortimer then began to read aloud the contents of the file to Officer Curtin. Stebens immediately objected and said that the officers could not be informed of the contents of the file. According to Stebens, Mortimer ignored his objections and continued to read aloud the contents to Officer Curtin, who recorded the contents on the inventory receipt. Stebens strongly objected "when a certain confidential document was read out loud by ... Mortimer." Stebens picked up the telephone to call Magill, but Officer Curtin ordered Stebens to put down the telephone and stated he could not call anyone during the execution of the search warrant.
According to Mortimer, Stebens did not make any objections or comments as he filled out the inventory receipt for the contents of the file. Mortimer recalled that Stebens tried to make a telephone call and was prevented by the officers. Mortimer declared that he kept the John Doe file away from the officers while he reviewed the contents.
Mortimer declared that Officer Curtin assisted in compiling the inventory receipt, and Curtin filled out the form "following my dictation of the particular items." Mortimer recited a description of each item to Curtin, then placed that item into a large manila envelope. Mortimer further declared:
"While dictating the description of each item, I made every effort to avoid disclosing the name of the party involved with the van which was the subject of the materials seized under the search warrant. In reviewing the contents of the file, I read only enough of the document to determine that, in my opinion, it was covered by the warrant and then deposited each of the items listed on the inventory into the large manila envelope. At the time I reviewed the contents of the file, I did not read enough of it to determine the name of the party involved with the file nor the identity of any of the vehicles involved."
Thereafter, Mortimer sealed the manila envelope containing the contents of the file. Mortimer and Officer Curtin signed the inventory receipt and gave a copy to Stebens. Mortimer personally delivered the sealed file to Judge DeGroot later that afternoon.
Yet another version of this incident is provided by Officer Paul Curtin. Officer Curtin declared he could not see the contents of the folder when Mortimer reviewed the materials. Curtin assisted Mortimer in the preparation of the inventory receipt. Curtin used a CHP search warrant receipt form, which consisted of a single page and produced an original and two copies. According to Curtin, Mortimer read aloud a "generic description of the individual items in the folder," and Curtin recorded Mortimer's words on the inventory receipt.
The inventory receipt is included in the instant record as an exhibit to Real Party's informal response and return, filed by the Attorney General.[3] The inventory receipt describes 17 items which were in the file, including a videotape and several packages of photographs. The inventory receipt also lists Magill's file notes, receipts for copying and developing, and copies of newspaper articles.
In addition, the inventory receipt describes several documents from a rental company with great specificity, including the name of the rental company and the form number, of the contract number. The receipt also identifies two business cards from that rental company, and identifies *372 the names on the cards. The receipt is signed by Mortimer and Curtin.
According to Officer Curtin, Mortimer affixed the original version of the inventory receipt to the sealed envelope which contained the John Doe file. Mortimer gave one copy to Stebens. Officer Curtin kept the second copy of the inventory receipt.
Officer Curtin accompanied Mortimer to the courthouse, and observed Mortimer hand the sealed file to Judge DeGroot. Officer Curtin made copies of his inventory sheet and "gave both Mr. Mortimer and [Deputy District Attorney] Keitz one copy each."
After completing the search at Stebens's residence, Special Master Mortimer and the officers arrived at Magill's residence. No one was home, and the officers gained entry through a sliding door. Mortimer conducted a search for the relevant items but did not find anything related to the accident. Magill was renting the house from Colin and Kathy Kooyumjian. As the officers were leaving, Kathy Kooyumjian arrived and objected to the search. She contacted Colin Kooyumjian by cell phone, and Kooyumjian spoke to Lieutenant Leist and Mortimer. Kooyumjian objected to the search, claimed any material sought by the warrant was protected by the attorney-client privilege, and asserted that civil liability would accrue if they conducted the search. Mortimer explained that nothing had been seized from Magill's residence.

The Penal Code section 1524 hearing
On March 20 and 23, 2000, a hearing was held by Judge DeGroot in the matter of search warrants Nos. 1289 and 1290, pursuant to Penal Code section 1524, to determine the claim of petitioners Magill, Stebens, and John Doe that the seized file was protected by the attorney-client privilege. Petitioners were represented by John Moore. Deputy District Attorney Michael Keitz, who had participated in the tape-recorded telephone call, represented the People. Mr. Moore asserted all the items in the seized file were protected by the attorney-client privilege because the contents revealed the identity of Magill's client, John Doe. The court noted it possessed the sealed file and the inventory receipt which listed 17 items in the file. Mr. Moore replied he had a copy of the inventory receipt.
The first part of the hearing was held publicly, in the presence of other witnesses and the prosecutor. Petitioner Magill testified regarding his retention by John Doe, as set forth above. John Doe gave Magill a newspaper article about the traffic accident, which described a white van with a trailer as the suspect vehicle. Doe asked Magill to take photographs of a vehicle and a trailer, and show the photographs to the CHP to determine whether the officers were looking for that type of vehicle. Doe specifically instructed Magill not to disclose any information about him, and to assert the attorney-client privilege if anyone tried to discover Doe's identity. Magill testified that Stebens took the photographs and videotape at his direction. Thereafter, Magill contacted the CHP's field office in Fresno, and "told them that I had photographs of a van that appeared to fit the description of a van that they were looking for involved with an accident."
Magill testified he was subsequently contacted by Officer Shepard, and told Shepard that "I had photographs of a vehicle that fit the description of a vehicle that he was investigating, and I wanted him to receive those photographs and to eliminate that vehicle as a possible suspect vehicle." Shepard picked up the photographs, but called Magill and asked for additional photographs of the entire vehicle. Magill agreed but said he would redact the photographs to block out the vehicle's license plate number. Magill testified that Officer Shepard wanted unredacted photographs which depicted the license plate, but Magill explained that he had to comply with John Doe's directions to keep his identity anonymous. *373 Magill further testified he was frustrated by Shepard's refusal to give him any information about the traffic accident or whether any witnesses had identified John Doe's vehicle as being involved.
Magill also testified regarding the telephone conversation with Deputy District Attorney Keist. Magill refused to give Keist any information about John Doe without his client's authority. Magill also told Keist that he did not have any personal knowledge as to the type of vehicle involved in the fatal accident, or if John Doe's vehicle had been involved. Magill realized the telephone conversation was on a speakerphone when Officer Shepard made a remark about Magill's earlier comments. Magill was not aware the conversation was being monitored or tape-recorded, and he ended the call.
Magill testified he was unaware of the existence of the search warrants until after the completion of the search of Stebens's residence. He was aware that Stebens objected to turning over the John Doe file to Special Master Mortimer, and that Stebens objected to the manner in which Mortimer read aloud the contents to an officer while compiling the inventory receipt. Magill testified that he spoke with Stebens after the search, and Stebens told him that he had objected to Mortimer's conduct in "reading from the file contents out loud to law enforcement while they were doing the inventory list, saying they're saying they're in violation of the attorney-client privilege by reading the file to law enforcement to do an inventory." The prosecutor objected to this testimony and moved to strike as hearsay, and the court sustained the objection. Mr. Moore asserted that Magill's testimony was not being offered for the truth of the matter, but for the fact that Magill was advised of the manner of the search. The court permitted the testimony for that limited purpose. Magill testified that he never took either possession or control of the van or trailer.
On cross-examination, the prosecutor asked Magill if he had seen copies of the search warrant affidavit and the inventory receipt. Magill replied that he had seen both documents. The prosecutor asked whether the items in the inventory receipt, such as the newspaper articles, had been given to him by John Doe. Magill refused to make any comments as to the seized items "other than to say those are attorney-client privileged." Magill further stated that he objected to the prosecutor "having possession of an itemized list that indicates what was discovered from my file in your possession because it violates my client's attorney-client privilege by you possessing it." The prosecutor objected to Magill's statement as non-responsive, and the court ordered the answer stricken.[4]
The prosecutor continued his cross-examination and asked Magill whether he had given the documents to Stebens which had been seized pursuant to the warrant. Mr. Moore objected, and asked the court to make a determination as to petitioners' claims of attorney-client privilege prior to any questions about the contents of the file. The court agreed that the prosecutor could not ask about the contents of the file prior to its determination of the applicability of the attorney-client privilege. The prosecutor replied the contents were not privileged unless Magill was willing to testify that his client gave him the documents which were placed in the file and seized from Stebens. Mr. Moore again objected and argued the prosecutor could not force Magill to disclose John Doe's identity without the court reaching the ultimate issue of the privilege. The court agreed and the *374 prosecutor ended his cross-examination of Magill.
Myrl Stebens also testified concerning his work with Magill, and his contact with John Doe to take the photographs of the white van and the trailer. Stebens testified he took the photographs of a "white Ford truck, van-type truck" at a public parking lot. He also videotaped a blue trailer. Stebens did not take possession or control of either the van or the trailer.
On direct examination by Mr. Moore, Stebens testified he located the blue trailer "at a trailer rental establishment located approximately one block or block and a half north of the Blackstone address we were at," and identified the rental company by name. Stebens further testified the trailer was "located in the back lot of the rental establishment. I went back with the client to identify the specific trailer that he indicated needed to be photographed," and he took videotape footage of the trailer. Stebens testified the rental company maintained possession and control of the trailer at all times, and an employee of the rental company objected to the videotaping of the trailer based on instructions from "their risk management department or someone that had the authority to make that decision." Mr. Moore did not object to this testimony or request the court to strike Stebens's reference to the name of the rental company.[5]
Stebens also testified regarding Special Master Mortimer's compilation of the inventory receipt. During this portion of the testimony, Mr. Moore introduced "a copy of a search warrant receipt" and requested it be marked as exhibit No. 1. Stebens identified the exhibit as the receipt which Mortimer compiled at Stebens's request. Stebens testified that Mortimer read aloud the contents of the file to Officer Curtin, who filled out the inventory receipt. Stebens objected to Mortimer's conduct in reading aloud the contents to Officer Curtin. Mortimer sealed the file after Officer Curtin completed the inventory receipt.
After the completion of Stebens's testimony, Mr. Moore requested the court admit into evidence exhibit No. 1, the inventory receipt. The prosecutor did not object, and the court accepted the exhibit into evidence.
Thereafter, the court invited argument from the parties as to the applicability of the attorney-client privilege to the contents of the John Doe file seized from Stebens's residence. The court briefly inquired as to whether Magill had waived the privilege by giving "doctored" photographs to the officers, and whether such conduct amounted to a publication. Petitioners argued the photographs were protected by the attorney-client privilege because disclosure of the vehicle's license plate number could lead to the identity of the client, and John Doe had instructed Magill not to divulge his identity to law enforcement officers. Petitioners further argued the identity of an attorney's client was privileged where such disclosure would subject the client to criminal prosecution. Petitioners acknowledged there was a fine line over which an attorney was obliged to turn over evidence of a crime to officers, but argued they were never in possession of such evidence.
The prosecutor asserted petitioners waived any privilege when Magill voluntarily gave the photographs to Officer Shepard, and such publication supported the full disclosure of the unredacted photographs. The prosecutor also argued petitioners were in constructive possession of evidence of a crime because they had access to the van and the trailer for purposes of taking the photographs and the videotape.
The court decided that petitioners had not waived the privilege through publication of the redacted photographs to the officers. However, the court found that *375 photographs, negatives, and videotapes were not communications within the meaning of the attorney-client privilege, and such protected communications were limited to oral or written communications by the client to the attorney. The court believed that if an attorney received photographs from a client, without a note or covering message, such photographs were not protected oral or written communications within the privilege. The court ruled that the photographs, negatives, and videotape in the file seized from Stebens's residence were not protected by the attorneyclient privilege. However, the court found the remainder of the items in the file were within the privilege.
Petitioners again objected that the photographs would lead to John Doe's identity, and the client's identity was protected by the attorney-client privilege if disclosure would lead to criminal prosecution. The prosecutor argued the rental company documents were "hard evidence" and not protected by the attorney-client privilege.
The court decided to further review the contents of the sealed file in an in camera hearing in order to protect any communications from the client that were in the file. However, the court again found that the photographs, which depicted the vehicle's license plate number, were not protected communications. The court found there was reasonable cause to believe the vehicle was involved in a felony hit-and-run accident, and the photographs and videotape were physical evidence needed to further investigate the felony criminal offense of the fatal accident. The court found the rest of the file was not subject to discovery. In addition, the court stated its intent to stay all proceedings and seal the contents of the file based on petitioners' decision to seek further review of this matter with the Fifth District Court of Appeal.
Throughout the hearing, petitioners repeatedly stated they were only raising the issue of attorney-client privilege, and they were not making a motion to suppress pursuant to Penal Code section 1538.5.

The in camera hearing
Thereafter, the court excused the prosecutor and conducted an in camera hearing with petitioners to examine all the contents of the sealed file. The court examined the photographs and videotape, and again found they were not protected by the attorney-client privilege. The court noted that although the officers could not ask Magill the location of the van, they had the right to go look for it and the license plate number could be revealed. The court also noted that there would be nothing in the file to lead the officers to John Doe if Magill had not taken the photographs of the vehicle.
Petitioners asserted the photographs were protected by the work product doctrine. The court rejected the argument, and petitioners withdrew the work product claim from the hearing. Nevertheless, the court examined the work product doctrine and determined the photographs were not protected by the doctrine because they were evidence in a criminal investigation.
Petitioners argued that even if the officers were entitled to the photographs as evidence of the instrumentality of a crime, Magill was not obliged to reveal the location of such evidence and disclosure of the license plate number amounted to such a breach of the attorney-client privilege. The court acknowledged that if the officers used the photographs to obtain the vehicle's license plate number and prosecuted John Doe, the prosecutor could not introduce evidence as to the manner in which it learned of John Doe's identity at a subsequent criminal trial because "that violates the attorney-client privilege."
The court also examined the rental documents in the file, which contained John Doe's name. The court found these documents were protected by the attorneyclient privilege and not subject to discovery because "they would appear on the surface, at least without litigating it further, in the Court's opinion, privileged information *376 because purportedly the client whose name appears on them gave them to you." Magill replied the court was correct.

The court's disclosure order
At the conclusion of the in camera hearing, the court directed the prosecutor to return to the courtroom and issued its final ruling as to the applicability of the attorney-client privilege to the contents of the John Doe file. The court again found the photographs and videotape were not protected and could be disclosed to the prosecution, but the remaining items were protected by the privilege. The court stayed its ruling and sealed the discoverable items for one week to allow petitioners the opportunity to seek writ review of its order. If petitioners failed to obtain a stay order from the Fifth District Court of Appeal, the court would unseal the photographs for disclosure to the prosecution.
The court further directed the clerk to copy all items in the sealed file to turn over to Magill, after which time the clerk was ordered to reseal the manila envelope with the contents pending further action. The court noted the prosecutor may have a claim to other evidence in the file, and the court would retain the entirety of the sealed file pending further proceedings.

PART II

THE WRIT PROCEEDINGS

The petition
On March 27, 2000, petitioners Charles Magill, Myrl Stebens and John Doe filed a petition for writ of mandamus and request for appeal with this court, supported by various declarations regarding the matters set forth above. Petitioners asserted that John Doe's identity was protected by the attorney-client privilege because disclosure of his identity would lead to criminal prosecution for the very matter he sought legal representation. Petitioners argued the disclosure of the videotape and unedited photographs would reveal the vehicle's license plate, which would lead to the client's identity. Petitioners argued the videotape and photographs were thus protected by the attorney-client privilege.
Petitioners asserted that Special Master Mortimer violated the duties of his office by allowing Officer Curtin to participate in the compilation of the inventory receipt. Petitioners argued that Mortimer published the contents of the confidential file by reading the contents aloud to Officer Curtin, despite Stebens's objections.
Petitioners also asserted Deputy District Attorney Keitz was improperly in possession of the inventory receipt, and that he published information contained within the sealed file to third parties. According to Magill's declaration, he observed Keitz in possession of the inventory receipt during the court's hearing on petitioners' assertion of the privilege, and objected to his possession of the document because the contents were privileged. The trial court sealed the entirety of the file pending further review of its order by the Fifth District. However, Magill declared that Keitz had disclosed the inventory receipt to attorney Carmen Eanni, who represented the families of the victims who died in the vehicular accident. Magill declared that after the court's ruling, he observed Eanni, Keitz and Officer Shepard engaged in conversation. The next day, Magill received a letter from Eanni stating that he had scheduled an ex parte hearing to inspect evidence prior to commencement of an action, in which he would seek an order permitting inspection of the vehicles and/or evidence owned or possessed by the persons involved in the fatal vehicular accident.
Petitioners requested this court to review the trial court's ruling as to the disclosure of the videotape and the photographs, and petitioners' claim of attorneyclient privilege. Petitioners also requested this court to issue an immediate stay of the trial court's order pending the outcome of the petition, and order all parties, including the district attorney's office and the *377 CHP, to destroy all copies of seized evidence, original and copies of notations made concerning the contested file, and return any and all original documents to the Fifth District pending resolution of the matter. Petitioners also requested this court to stay the civil proceedings initiated by Mr. Eanni, and order the district attorney's office and the CHP not to communicate any information obtained from the sealed file to third parties.

This court's stay order
On March 28, 2000, this court issued an order which stayed the trial court's order for disclosure of the videotape and photographs, pending determination of the petition for writ of mandamus or further order of this court. This court also ordered:
"The balance of the seized documents, as well as original and copies of notations made concerning said seized materials shall remain sealed pending further order of this court. Respondents and their agents are order[ed] to maintain the confidentiality of information gleaned from the seized documents pending further order of this court."
This court denied petitioners' request to intervene in the pending civil hearing initiated by Mr. Eanni because the request was premature and the proceeding to which the hearing related was not properly before this court.
This court further ordered Real Party to file an informal response to the merits of the petition.

Real Party's informal response
On April 24, 2000, Real Party filed an informal response to the petition for writ of mandamus. Real Party asserted the videotape and photographs were not protected by the attorney-client privilege because they did not constitute communications from a client to the attorney. While the fact may be privileged that the client delivered evidence to his attorney, the attorney's possession of the instrumentality of a crime is not privileged. Real Party argued the videotape and the photographs of the van and the trailer depicted evidence of the instrumentality of the fatal hit-and-run accident. Real Party also argued the client's identity was not privileged because the client was not automatically subject to prosecution. Finally, Real Party asserted Special Master Mortimer did not violate his statutory duties in his seizure of the sealed file, and there was no basis for petitioners' contention that the district attorney's office published confidential material from the contested file to third parties.
Real Party also asserted that the rental documents and the newspaper articles, listed in the inventory receipt, were not privileged, and requested this court order the disclosure of these materials to the CHP.
Real Party's informal response was supported by several exhibits, including declarations from Officer Shepard, Officer Curtin, and Special Master Mortimer, as discussed above. Exhibit E consisted of a copy of the inventory receipt, clearly identifying the rental documents which were in the sealed file, and stating the name of the rental company and the contract number.
The Attorney General, on behalf of Real Party, did not file the informal response or any of the exhibits under seal.

The order to show cause and return
On May 4, 2000, this court ordered that an order to show cause should issue as to why the relief prayed for in the petition for writ of mandamus should not be granted, returnable before this court on October 13, 2000. On May 16, 2000, this court filed the order to show cause.
On June 9, 2000, Real Party filed the return to the petition, which was identical to the informal response. Real Party again asserted the videotape and photographs, and the client's identity, were not matters protected by the attorney-client *378 privilege. Real Party also requested this court order the disclosure of the rental documents and the newspaper articles because such matters were not within the attorney-client privilege. Real Party's return was supported by the same exhibits filed with the informal response, including Exhibit E, the inventory receipt of the documents within the sealed file, which again listed the various rental documents within the file and identified the name of the rental agency. Again, the Attorney General, on behalf of Real Party, did not file the return or the exhibits under seal.

Petitioners' reply
On August 4, 2000, petitioners filed a reply to the return, reasserting their claims of attorney-client privilege to all items within the sealed file. Petitioners also reasserted their claims that Special Master Mortimer, the district attorney's office, and the CHP had violated the trial court's orders and published confidential information from the sealed file to third parties.
Petitioners additionally raised new charges of misconduct by the district attorney's office and the CHP, based on a new declaration filed by Magill as an exhibit to the reply. Magill noted this court's stay order sealed all documents and notations regarding the sealed file, and that this court further ordered the parties and their agents to maintain the confidentiality of information obtained from the seized documents pending further order of the court. According to Magill, on March 29, 2000, a particular rental trailer was seized by law enforcement officers, based on their reliance on information obtained from the documents within the sealed file. Magill declared there was no other source of information regarding the trailer other than the seized, confidential documents, which identified the name of the rental company.
Magill further declared that in or about April 2000, at least three search warrants and affidavits were drafted and filed with the Madera County Superior Court, based upon information directly obtained from the sealed file. The CHP executed the warrants, searched John Doe's residential property, and seized John Doe's vehicle. Magill declared there was no independent source to lead to the searches, aside from confidential information from the sealed file. In addition, a civil action had been filed and served upon John Doe in Madera County.
Magill declared that Real Party failed to abide by this court's stay order of March 28, 2000, and disclosed confidential information regarding the case to third parties, resulting in the search warrants and the civil action. Magill also declared that Real Party violated this court's stay order by publicly filing the inventory receipt as an exhibit to both the informal response and the return.
Petitioners' reply requested this court impose sanctions against Real Party for it's violations of this court's order of March 28, 2000. Petitioners requested this court order the informal response and return to be filed confidentially, nunc pro tunc; take physical possession of all original and copies of any documents or information obtained from the sealed file and in possession of respondents, and stay the civil proceedings filed against John Doe in Madera County.[6]
Petitioners further requested this court to schedule a contempt hearing regarding Real Party's violation of this court's order of March 28, 2000, and impose sanctions, attorney fees, and other appropriate relief.
*379 This court has deferred ruling on petitioners' request for sanctions pending its determination of the petition for writ of mandamus.

ISSUES
The instant mandamus proceeding presents several issues for this court's review. First, we must determine the appropriate standard of review, and whether respondents' return may be treated as also seeking writ relief.
We must next review the attorney-client privilege and the work product rule, and determine whether the videotape and unredacted photographs are independently protected from disclosure.
Next, we must address petitioners' alternative argument that John Doe's identity constitutes a confidential communication protected by the attorney-client privilege, and all items in the file are protected from disclosure by this rule.
Finally, we will address the manner in which the special master conducted the search and seizure of the file, and the numerous violations of Penal Code section 1524, the trial court's order, and this court's order to maintain the confidentiality of all items in the file pending a final judicial determination.

DISCUSSION

I.

REVIEW BY PETITION FOR WRIT OF MANDATE
We first review the manner in which this court may review the trial court's ruling as to the applicability of the attorney-client privilege to the contents of the John Doe file. Petitioners have filed both a petition for writ of mandate and a request for appeal of the trial court's ruling.
The instant case is the result of the trial court's decision to issue search warrants for the seizure of items for which an attorney has claimed the attorney-client privilege. The court appointed a special master pursuant to Penal Code section 1524 to execute the search warrants, seize the material, and maintain the confidentiality of the items pending the court's review of the attorney's claim of privilege. The trial court ultimately determined the videotape and photographs in the John Doe file were not protected from disclosure by the attorney-client privilege. Petitioners seek review of that determination, and argue the videotape and photographs are privileged materials.
The trial court's ruling does not constitute a judgment in a special proceeding, it is not the final determination of the rights of the parties in the matter, and there is no underlying final judgment. Thus, under Code of Civil Procedure section 1064, there is no final judgment or determination of the rights of the parties. Accordingly, there is no appealable order pursuant to Code of Civil Procedure section 904.1. (People v. Superior Court (Bauman & Rose) (1995) 37 Cal.App.4th 1757, 1761, 44 Cal.Rptr.2d 734.) As such, petitioners' request for an appeal from the trial court's ruling under Penal Code section 1524 must be rejected. (People v. Superior Court (Bauman & Rose), supra, 37 Cal.App.4th at p. 1761, 44 Cal.Rptr.2d 734.)
We will instead review the trial court's ruling based on the petition for writ of mandamus pursuant to Code of Civil Procedure section 1085. (People v. Superior Court (Bauman & Rose), supra, 37 Cal.App.4th at p. 1761, 44 Cal.Rptr.2d 734.) A writ of mandate will lie "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station; or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled...." (Code Civ. Proc., § 1085; Barnes v. Wong (1995) 33 Cal.App.4th 390, 394, 39 Cal.Rptr.2d 417.) The Supreme Court has long construed Code of Civil Procedure section 1085 as authorizing review of an asserted abuse of discretion by a lower court in making an interlocutory *380 order. (See 8 Witkin, Cal. Procedure (4th ed. 1997) Extraordinary Writs, § 99, p. 889.) Thus, when there is no other adequate remedy, mandamus is available to review rulings when an issue of sufficient importance to warrant extraordinary relief is presented. (Babb v. Superior Court (1971) 3 Cal.3d 841, 851, 92 Cal.Rptr. 179, 479 P.2d 379; 8 Witkin, Cal. Procedure, supra, Extraordinary Writs, §§ 106, 107, pp. 894-895.)
"When an extraordinary writ proceeding is the only avenue of appellate review, a reviewing court's discretion is quite restricted. `"Its issuance is not necessarily a matter of right, but lies rather in the discretion of the court, but where one has a substantial right to protect or enforce, and this may be accomplished by such a writ, and there is no other plain, speedy and adequate remedy in the ordinary course of law, he [or she] is entitled as a matter of right to the writ, or perhaps more correctly, in other words, it would be an abuse of discretion to refuse it."' (Dowell v. Superior Court (1956) 47 Cal.2d 483, 486-487, 304 P.2d 1009, quoting Potomac Oil Co. v. Dye (1909) 10 Cal.App. 534, 537, 102 P. 677; accord, May v. Board of Directors (1949) 34 Cal.2d 125, 133-134, 208 P.2d 661.)" (Powers v. City of Richmond (1995) 10 Cal.4th 85, 113-114, 40 Cal.Rptr.2d 839, 893 P.2d 1160.)
The petitioner must also demonstrate the basic prerequisites for issuance of an extraordinary writ, i.e., a beneficial interest in the matter, the absence of an adequate legal remedy, and abuse of trial court discretion. (Code Civ. Proc., §§ 1085, 1086; Robbins v. Superior Court (1985) 38 Cal.3d 199, 205, 211 Cal.Rptr. 398, 695 P.2d 695; Thelander v. City of El Monte (1983) 147 Cal.App.3d 736, 748, 195 Cal.Rptr. 318.)
"`While, of course, it is the general rule that mandamus will not lie to control the discretion of a court or officer, meaning by that it will not lie to force the exercise of discretion in a particular manner ... [it] will lie to correct abuses of discretion, and will lie to force a particular action by the inferior tribunal or officer, when the law clearly establishes the petitioner's right to such action.'" (Thelander v. City of El Monte, supra, 147 Cal.App.3d at p. 748,195 Cal.Rptr. 318.)
In reviewing a trial court's judgment on a petition for writ of ordinary mandate, we apply the substantial evidence test to the trial court's factual findings, but we exercise our independent judgment on legal issues. (Kreeft v. City of Oakland (1998) 68 Cal.App.4th 46, 53, 80 Cal.Rptr.2d 137.) Traditional mandamus pursuant to Code of Civil Procedure section 1085 will thus lie to correct an abuse of discretion when a petitioner clearly establishes his right to have discretion exercised in a particular manner. (Code Civ. Proc., § 1085; Coelho v. State Personnel Bd. (1989) 209 Cal.App.3d 968, 971, 257 Cal.Rptr. 557.)
Petitioners' petition for writ of mandate contends the trial court abused its discretion in finding the videotape and photographs in the John Doe file were not protected by the attorney-client privilege. Real Party's informal response and return to the order to show cause asserts the trial court did not abuse its discretion as to the videotape and the photographs. Within the informal response and return, however, Real Party raises the additional argument that the trial court erroneously determined the rental documents and the newspaper articles, which were also in the John Doe file, were protected by the attorney-client privilege. Real Party requests this court to find that such items are not privileged and should also be disclosed to the CHP.
We note that only petitioners Magill, Stebens, and Doe have filed a petition for writ of mandate from which we issued the order to show cause (OSC). Real Party did not file a petition to challenge any aspect of the trial court's ruling, or request this court issue peremptory relief and order *381 the disclosure of the rental documents and the newspaper articles. While this court may address any issue raised by the OSC, the only dispositions available in this mandate proceeding are denial of the petition for writ of mandate, or issuance of a peremptory writ directing the trial court to set aside its order providing for disclosure of the videotape and the photographs. (See generally, Palma v. U.S. Industrial Fasteners, Inc. (1984) 36 Cal.3d 171, 203 Cal.Rptr. 626, 681 P.2d 893.)
This court may deem the Real Party's request in the informal response and return as a petition for writ of mandate only if the technical requirements for a mandate petition are otherwise met. (Morehart v. County of Santa Barbara. (1994) 7 Cal.4th 725, 745-746, 29 Cal. Rptr.2d 804, 872 P.2d 143; Voss v. Superior Court (1996) 46 Cal.App.4th 900, 906, 54 Cal.Rptr.2d 225.) However, `"we should not exercise that power except in unusual circumstances.' [Citation.]" (Wells Properties v. Popkin (1992) 9 Cal.App.4th 1053, 1055, 11 Cal.Rptr.2d 845.) Such relief may be granted under extraordinary circumstances "`"compelling enough to indicate the propriety of a petition for writ ... in the first instance...." [Citation.]'" (Estate of Weber (1991) 229 Cal.App.3d 22, 25, 280 Cal.Rptr. 22, quoting DeGrandchamp v. Texaco, Inc. (1979) 100 Cal.App.3d 424, 437, 160 Cal.Rptr. 899; Doran v. Magan (1999) 76 Cal.App.4th 1287, 1294, 91 Cal. Rptr.2d 60.)
Real Party has failed to demonstrate that any unusual or extraordinary circumstances exist for this court to deem the informal response and return as creating a petition for writ of mandate to review that portion of the trial court's order which found the rental documents and newspaper articles were protected by the attorneyclient privilege.
Accordingly, we will limit our review to the issues raised in petitioners' petition for writ of mandate, and determine whether the videotape and unredacted photographs are protected by the attorney-client privilege, and whether the special master properly supervised the execution of the search warrant.

II.

THE ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT RULE
Petitioners assert the trial court erroneously found the videotape of the trailer and the unredacted photographs of the white Ford van were not protected by the attorney-client privilege. Petitioners contend such items were within John Doe's confidential file, and constitute confidential communications within the attorney-client privilege.
In order to resolve these issues, we must first review the basic principles behind the attorney-client privilege and the work product rule. We will then review the contents of the John Doe file to determine whether any of the items are, in and of themselves, protected from disclosure.

A. The attorney-client privilege

The attorney-client privilege authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client. (Mitchell v. Superior Court (1984) 37 Cal.3d 591, 599, 208 Cal.Rptr. 886, 691 P.2d 642.) The evidentiary privilege, while not constitutionally based, is the oldest recognized confidential communication privilege. (Sullivan v. Superior Court (1972) 29 Cal.App.3d 64, 71, 105 Cal.Rptr. 241; People v. Godlewski (1993) 17 Cal.App.4th 940, 945-946, 21 Cal. Rptr.2d 796.) It has been part of California statutory law in one form or another since 1851. (Southern Cal. Gas Co. v. Public Utilities Com. (1990) 50 Cal.3d 31, 37, 265 Cal.Rptr. 801, 784 P.2d 1373.)
The attorney-client privilege is based on grounds of public policy and is in furtherance of the proper and orderly functioning of our judicial system, which *382 necessarily depends on the confidential relationship between the attorney and the client. (People v. Velasquez (1987) 192 Cal.App.3d 319, 327, 237 Cal.Rptr. 366; People v. Gionis (1995) 9 Cal.4th 1196, 1207, 40 Cal.Rptr.2d 456, 892 P.2d 1199.) The purpose of the evidentiary privilege is to safeguard the confidential relationship between a client and counsel so as to promote full and open disclosure of facts and tactics surrounding the case. (People v. Flores (1977) 71 Cal.App.3d 559, 139 Cal. Rptr. 546; People v. Godlewski supra, 17 Cal.App.4th at pp. 945-946, 21 Cal.Rptr.2d 796.) Without the ability to make a full disclosure of the facts to the attorney, the client risks inadequate representation: "`Unless he makes known to the lawyer all the facts, the advice which follows will be useless, if not misleading; the lawsuit will be conducted along improper lines, the trial will be full of surprises, much useless litigation may result.'" (City & County of S.F. v. Superior Court (1951) 37 Cal.2d 227, 235, 231 P.2d 26; People v. Gionis, supra, 9 Cal.4th at p. 1207, 40 Cal.Rptr.2d 456, 892 P.2d 1199.) "If a lawyer could not promise to maintain the confidentiality of his client's secrets, the only advice he or she could provide would be,'"Don't talk to me."'" (Southern Cal. Gas Co. v. Public Utilities Com., supra, 50 Cal.3d at p. 37, 265 Cal.Rptr. 801, 784 P.2d 1373, quoting Welfare Rights Organization v. Crisan (1983) 33 Cal.3d 766, 771, fn. 3, 190 Cal. Rptr. 919, 661 P.2d 1073.)
In codifying the attorney-client privilege, the Legislature determined that "`the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence.'" (Mitchell v. Superior Court, supra, 37 Cal.3d 591, 600, 208 Cal. Rptr. 886, 691 P.2d 642, quoting City & County of San Francisco v. Superior Court, supra, 37 Cal.2d at p. 235, 231 P.2d 26; People v. Gionis, supra, 9 Cal.4th at p. 1207, 40 Cal.Rptr.2d 456, 892 P.2d 1199.) Thus, by encouraging complete disclosure, the attorney-client privilege enables the attorney to provide suitable legal representation. (City & County of San Francisco v. Superior Court, supra 37 Cal.2d at p. 235, 231 P.2d 26; People v. Clark (1990) 50 Cal.3d 583, 620, 268 Cal.Rptr. 399, 789 P.2d 127; People v. Gionis, supra, 9 Cal.4th at p. 1207, 40 Cal.Rptr.2d 456, 892 P.2d 1199.)
In the criminal context, "these policies assume particular significance: `"As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice." ... Thus, if an accused is to derive the full benefits of his right to counsel, he must have the assurance of confidentiality and privacy of communication with his attorney.' [Citations.]" (People v. Meredith (1981) 29 Cal.3d 682, 691, 175 Cal.Rptr. 612, 631 P.2d 46; People v. Gionis, supra 9 Cal.4th at p. 1207, 40 Cal.Rptr.2d 456, 892 P.2d 1199.) In a criminal case, the privilege also serves to preserve a defendant's privilege against self-incrimination that might otherwise be deemed to have been waived by his revelation of incriminating information. (People v. Clark, supra 50 Cal.3d 583, 620, 268 Cal.Rptr. 399, 789 P.2d 127; see also Neku v. U.S. (D.C.App.1993) 620 A.2d 259, 262 ["In the criminal context the privilege acquires Sixth Amendment protection. [Citations.]"].) The attorney-client privilege helps to implement the accused's constitutional right to effective representation because "if an accused is to derive the full benefits of his right to counsel, he must have the assurance of confidentiality and privacy of communication with his attorney." (Barber v. Municipal Court (1979) 24 Cal.3d 742, 751, 157 Cal.Rptr. 658, 598 P.2d 818; People v. Godlewski, supra, 17 Cal.App.4th at pp. 945-946, 21 Cal.Rptr.2d 796.)
As codified in Evidence Code section 950 et seq., the attorney-client *383 privilege provides for a client to refuse to disclose, and to prevent another from disclosing, a confidential communication between the client and his/her lawyer. (Evid.Code, § 954; People v. Coddington (2000) 23 Cal.4th 529, 605, 97 Cal.Rptr.2d 528, 2 P.3d 1081; Nalian Truck Lines, Inc. v. Nakano Warehouse & Transportation (1992) 6 Cal.App.4th 1256, 1264, 8 Cal.Rptr.2d 467.) A "client" includes a person who "consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity." (Evid.Code, § 951; People v. Gionis, supra, 9 Cal.4th at p. 1207, 40 Cal.Rptr.2d 456, 892 P.2d 1199.) The privilege applies not only to communications made in anticipation of litigation, but also to legal advice when no litigation is threatened. (Roberts v. City of Palmdale (1993) 5 Cal.4th 363, 371, 20 Cal.Rptr.2d 330, 853 P.2d 496.)
The term "confidential communication" is broadly construed, and defined as either "information transmitted between a client and his lawyer" or "advice given by the lawyer." (Evid.Code, §§ 917, 952; People v. Clark, supra, 50 Cal.3d at p. 618, 268 Cal.Rptr. 399, 789 P.2d 127; Gordon v. Superior Court (1997) 55 Cal. App.4th 1546, 1557, 65 Cal.Rptr.2d 53.) The protected communication not only includes information given from a client to the attorney, but also the legal opinions and advice tendered by the attorney to the client in the course of their professional relationship. (Evid.Code, § 952; Roberts v. City of Palmdale, supra, 5 Cal.4th at p. 371, 20 Cal.Rptr.2d 330, 853 P.2d 496; People v. Hayes (1999) 21 Cal.4th 1211, 1265, 91 Cal.Rptr.2d 211, 989 P.2d 645; Nalian Truck Lines, Inc. v. Nakano Warehouse & Transportation, supra, 6 Cal.App.4th at p. 1265, 8 Cal.Rptr.2d 467.) "[A]lmost any act, done by the client in the sight of the attorney and during the consultation, may conceivably be done by the client as the subject of a communication, and the only question will be whether, in the circumstances of the case, it was intended to be done as such. The client, supposedly, may make a specimen of his handwriting for the attorney's information, or may exhibit an identifying scar, or may show a secret token. If any of these acts are done as part of a communication to the attorney, and if further the communication is intended to be confidential ... the privilege comes into play.'" (City and County of San Francisco v. Superior Court, supra, 37 Cal.2d at p. 235, 231 P.2d 26.)
The communication must be intended by the client to be treated in confidence. (Nalian Truck Lines, Inc. v. Nakano Warehouse & Transportation, supra, 6 Cal.App.4th at p. 1264, 8 Cal. Rptr.2d 467.) The client's communication retains its confidential nature, even though made to an agent of the attorney, if the disclosure to that agent is reasonably necessary for the transmission of information to the attorney. (Evid.Code, § 952; National Steel Products Co. v. Superior Court (1985) 164 Cal.App.3d 476, 483, 210 Cal.Rptr. 535.) An investigator retained by an attorney to assist in the client's case is a person encompassed by the privilege, and stands in the same position as the attorney for purposes of the privilege. (People v. Meredith, supra, 29 Cal.3d at p. 690, fn. 3, 175 Cal.Rptr. 612, 631 P.2d 46.) Thus, the client's communications to the attorney's investigator are within the privilege because the investigator is the attorney's agent and the client's sub-agent, and is acting for the client. (Ibid.; see also City & County of San Francisco v. Superior Court, supra, 37 Cal.2d at pp. 236-237, 231 P.2d 26; Rodriguez v. Superior Court (1993) 14 Cal.App.4th 1260, 1266, 18 Cal. Rptr.2d 120; State Farm Fire & Casualty Co. v. Superior Court (1997) 54 Cal. App.4th 625, 639, 62 Cal.Rptr.2d 834.)
However, a communication which was not privileged to begin with may not be made so by subsequent delivery to the attorney. (Alpha Beta Co. v. Superior Court (1984) 157 Cal.App.3d 818, 824-825, 203 Cal.Rptr. 752; Nalian Truck Lines, Inc. v. Nakano Warehouse & *384 Transportation, supra, 6 Cal.App.4th at pp. 1264-1265, 8 Cal.Rptr.2d 467; D.I. Chadbourne, Inc. v. Superior Court (1964) 60 Cal.2d 723, 732-733, 36 Cal.Rptr. 468, 388 P.2d 700.) "`Knowledge which is not otherwise privileged does not become so merely by being communicated to an attorney.... While the privilege fully covers communications as such, it does not extend to subject matter otherwise unprivileged merely because that subject matter has been communicated to the attorney.'" (Greyhound Corp. v. Superior Court (1961) 56 Cal.2d 355, 397, 15 Cal.Rptr. 90, 364 P.2d 266; Martin v. Workers' Comp. Appeals Bd. (1997) 59 Cal.App.4th 333, 344, 69 Cal.Rptr.2d 138.) "[transmission alone, even where the parties intend the matter to be confidential, cannot create the privilege if none, in fact, exists." (Suezaki v. Superior Court (1962) 58 Cal.2d 166, 176, 23 Cal.Rptr. 368, 373 P.2d 432.) Documents which are independently prepared by a party do not become privileged communications merely because they are turned over to counsel. (Wellpoint Health Networks, Inc. v. Superior Court (1997) 59 Cal.App.4th 110, 119, 68 Cal.Rptr.2d 844.)
The privilege does not protect independent facts related to a communication, that a communication took place, and the time, date and participants in the communications. (State Farm Fire & Casualty Co. v. Superior Court, supra, 54 Cal. App.4th at p. 640, 62 Cal.Rptr.2d 834.) Further, the privilege does not protect disclosure of underlying facts which may be referenced within a qualifying communication, and it does not extend to independent witnesses. (State Farm Fire & Casualty Co. v. Superior Court, supra, 54 Cal. App.4th at p. 639, 62 Cal.Rptr.2d 834; Martin v. Workers' Comp. Appeals Bd., supra, 59 Cal.App.4th at p. 345, 69 Cal. Rptr.2d 138.)
In addition, an attorney may not retain physical evidence pertaining to a crime charged against the client, and a client may not permanently sequester physical evidence such as a weapon or other article used in perpetration of a crime by delivering it to his attorney. (People v. Superior Court (Fairbank) (1987) 192 Cal.App.3d 32, 34-35, 237 Cal. Rptr. 158.) The fact the client delivered the evidence to the attorney may be privileged and not disclosed, but the physical object does not become privileged merely because it was given to the attorney. (People v. Lee (1970) 3 Cal.App.3d 514, 526, 83 Cal.Rptr. 715.) An attorney also has an absolute obligation to provide the prosecution with access to physical evidence and information about its alteration. (People v. Superior Court (Fairbank), supra, 192 Cal.App.3d at p. 40, 237 Cal.Rptr. 158.) Whenever the attorney removes or alters evidence, the statutory privilege does not bar revelation of the original location or condition of the evidence in question. (People v. Meredith, supra, 29 Cal.3d at p. 695, 175 Cal.Rptr. 612, 631 P.2d 46.)
The client holds the privilege to prevent disclosure of the confidential communication between the client and the attorney, and only the holder may waive the privilege. (Evid.Code, §§ 953, 954; People v. Hayes, supra, 21 Cal.4th at p. 1265, 91 Cal.Rptr.2d 211, 989 P.2d 645; People v. Gionis, supra, 9 Cal.4th at p. 1207, 40 Cal.Rptr.2d 456, 892 P.2d 1199.) The right to claim the privilege is waived "with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceedings in which the holder has the legal standing and opportunity to claim the privilege." (Evid.Code, § 912; People v. Hayes, supra, 21 Cal.4th at p. 1265, 91 Cal.Rptr.2d 211, 989 P.2d 645.) However, waiver of the privilege as to one aspect of a protected relationship does not necessarily waive *385 the privilege as to other aspects of the privileged relationship. (Rodriguez v. Superior Court, supra, 14 Cal.App.4th at p. 1270, 18 Cal.Rptr.2d 120.) In addition, an attorney's inadvertent disclosure of a privileged communication to a third party does not constitute a waiver by the holder. (State Comp. Ins. Fund v. WPS Inc. (1999) 70 Cal.App.4th 644, 656-657, 82 Cal. Rptr.2d 799.)
When a party asserts the attorney/client privilege, it is incumbent upon that party to prove the preliminary fact that a privilege exists. (Mahoney v. Superior Court (1983) 142 Cal.App.3d 937, 940, 191 Cal.Rptr. 425.) Once the foundational facts have been presented, i.e., that a communication has been made "in confidence in the course of the lawyer-client ... relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential," or that an exception exists. (Evid.Code, § 917; BP Alaska Exploration, Inc. v. Superior Court (1988) 199 Cal.App.3d 1240, 1262, 245 Cal.Rptr. 682; State Farm Fire & Casualty Co. v. Superior Court, supra, 54 Cal.App.4th at p. 639, 62 Cal.Rptr.2d 834.)

B. The work product rule

The statutory protection afforded an attorney's work product is not one of the enumerated privileges, but a separate and distinct doctrine applicable in both civil and criminal proceedings. (People v. Coddington, supra, 23 Cal.4th at p. 605, 97 Cal.Rptr.2d 528, 2 P.3d 1081; Kizer v. Sulnick (1988) 202 Cal.App.3d 431, 435, fn. 3, 248 Cal.Rptr. 712; Hobbs v. Municipal Court (1991) 233 Cal.App.3d 670, 691, fn. 19, 284 Cal.Rptr. 655.)
The work product doctrine was recognized in Hickman v. Taylor (1947) 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451, which established a qualified privilege for certain materials prepared by an attorney acting for his client in anticipation of litigation.
"Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible waysaptly though roughly termed by the Circuit Court of Appeals in this case as the Svork product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." (Hickman v. Taylor, supra, 329 U.S. at pp. 510-511, 67 S.Ct. 385.)
A "workable" definition of work product also includes "`the product of [the attorney's] effort, research, and thought in the preparation of his client's case. It includes the results of his own work, and the work of those employed by him or for him by his client, in investigating both the favorable *386 and unfavorable aspects of the case, the information thus assembled, and the legal theories and plan of strategy developed by the attorneyall as reflected in interviews, statements, memoranda, correspondence, briefs, and any other writings reflecting the attorney's "impressions, conclusions, opinions, or legal research or theories," and in countless other tangible and intangible ways.'" (BP Alaska Exploration, Inc. v. Superior Court, supra, 199 Cal.App.3d at pp. 1253-1254, fn. 4, 245 Cal.Rptr. 682.)
The work product rule reflects "the policy of the state to: (1) preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of the case; and (2) to prevent attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc., § 2018, subd. (a); People v. Coddington, supra, 23 Cal.4th at p. 606, 97 Cal.Rptr.2d 528, 2 P.3d 1081.) The doctrine protects the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. (Hobbs v. Municipal Court, supra, 233 Cal.App.3d at p. 692, 284 Cal. Rptr. 655.) It also protects work prepared by the attorney even if the attorney was working in a nonadversarial context. (Kizer v. Sulnick, supra, 202 Cal.App.3d at p. 440, 248 Cal.Rptr. 712; County of Los Angeles v. Superior Court (2000) 82 Cal. App.4th 819, 833, 98 Cal.Rptr.2d 564.)
Code of Civil Procedure section 2018, subdivision (c) absolutely bars the use of statutory discovery procedures to obtain an attorney's "core" work product, defined as "[a]ny writing reflecting an attorney's impressions, conclusions, opinions, or legal research or theories." (Izazaga v. Superior Court (1991) 54 Cal.3d 356, 381-382, fn. 19, 285 Cal.Rptr. 231, 815 P.2d 304; State Farm Fire & Casualty Co. v. Superior Court, supra, 54 Cal.App.4th at pp. 649-650, 62 Cal.Rptr.2d 834.) An attorney's impressions and conclusions are thus given absolute protection. (Kizer v. Sulnick, supra, 202 Cal.App.3d at p. 440, 248 Cal.Rptr. 712.)
In contrast, section 2018, subdivision (b) establishes a conditional or qualified protection for general work product, and bars discovery of any other aspect of an attorney's work product unless denial of discovery would unfairly prejudice a party or result in an injustice. (People v. Coddington, supra, 23 Cal.4th at p. 605, 97 Cal.Rptr.2d 528, 2 P.3d 1081; State Farm Fire & Casualty Co. v. Superior Court, supra, 54 Cal.App.4th at p. 650, 62 Cal. Rptr.2d 834; BP Alaska Exploration, Inc. v. Superior Court, supra, 199 Cal.App.3d at p. 1250, 245 Cal.Rptr. 682.) The determination of good cause contemplates a balancing of the need for disclosure against the purpose served by the work-product doctrine. (National Steel Products Co. v. Superior Court (1985) 164 Cal.App.3d 476, 490, 210 Cal.Rptr. 535.)
In claiming the statutory protection, counsel must do more than merely state that something is protected by the work product rule. The burden is on the attorney to prove the preliminary facts to show the work product rule applies. (Fellows v. Superior Court (1980) 108 Cal. App.3d 55, 66, 166 Cal.Rptr. 274; 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 141, p. 403.)
While the work product rule also applies in criminal cases, its application is limited by Penal Code section 1054.6, which is part of the criminal reciprocal discovery statute. (Izazaga v. Superior Court, supra, 54 Cal.3d at pp. 381-382, 285 Cal.Rptr. 231, 815 P.2d 304.) Penal Code section 1054.6 provides: "Neither the defendant nor the prosecuting attorney is required to disclose any materials or information which are work product as defined in subdivision (c) of Section 2018 of the Code of Civil Procedure." The criminal reciprocal discovery scheme thus solely recognizes the absolute protection for *387 "core" work product defined in section 2018, subdivision (c) of the Code of Civil Procedure, and does not embrace the broader qualified work product protection of section 2018, subdivision (b). (Izazaga v. Superior Court, supra, 54 Cal.3d at pp. 381-382, fn. 19, 285 Cal.Rptr. 231, 815 P.2d 304; Hobbs v. Municipal Court, supra, 233 Cal.App.3d at p. 695, 284 Cal.Rptr. 655.)

C. John Doe's retention of Magill

As a preliminary matter, we note that John Doe's retention of Magill invokes several aspects of the attorney-client privilege. John Doe retained Magill to determine the nature of the CHP's investigation of the fatal vehicular accident. There was no pending litigation against Doe, but he clearly retained Magill to determine his potential criminal culpability or civil liability arising from the accident. Doe's direct communications to Magill, and Magill's legal advice to Doe, were exchanged under confidential circumstances in the absence of unauthorized third parties. Magill's use of Stebens to further investigate the matter did not mitigate the confidential nature of their communications. Stebens acted as Magill's agent and Doe's sub-agent, and any communications from Doe to Stebens would also be within the privilege.
Doe authorized Magill to publish certain information to the CHP in the course of his work, and the limited waiver does not constitute a full waiver as to all aspects of their confidential communications. (See, e.g., Klang v. Shell Oil Co. (1971) 17 Cal.App.3d 933, 938, 95 Cal.Rptr. 265.) Doe, as the holder of the privilege, did not authorize disclosure of the videotape, the unredacted photographs, the rental documents, or any other item in the file. Doe repeatedly instructed Magill to maintain the confidentiality of his identity.
In addition, Doe did not authorize Stebens to disclose the location of the blue trailer. As discussed in part I of the factual statement, supra, Stebens testified at the Penal Code section 1524 hearing that he met with John Doe at the rental company, they located the blue trailer on the lot, and Stebens took the videotape of the trailer at that time. Magill did not object on Doe's behalf to this testimony. However, to the extent the location of the trailer was protected by the attorney-client privilege, it cannot be said that Stebens's inadvertent reference to the name of the rental company at the Penal Code section 1524 hearing constituted a waiver on Doe's behalf.
Thus, Doe's confidential communications to Stebens or Magill, to the extent such communications exist, would be protected from disclosure by the attorney-client privilege. In addition, any material in the John Doe file representing Magill's impressions, conclusions, opinions, or legal research or theories about the case would also be protected from disclosure as core work product.

D. The videotape and the photographs

We now turn to the videotape and photographs in the John Doe file and determine if these items are, in and of themselves, protected from disclosure by the attorney-client privilege. There is no question that videotapes and photographs constitute communications within the meaning of the evidentiary privilege. (Evid.Code, § 250; Rubio v. Superior Court (1988) 202 Cal.App.3d 1343, 1347, 249 Cal.Rptr. 419; Binder v. Superior Court (1987) 196 Cal.App.3d 893, 897, 242 Cal.Rptr. 231; Hiott v. Superior Court (1993) 16 Cal.App.4th 712, 715, fn. 2, 20 Cal.Rptr.2d 157.) The issue, however, is whether these items are either "information transmitted between a client and his lawyer" or "advice given by the lawyer," and thus constitute "confidential communications" protected from disclosure by the attorney-client privilege. (Evid.Code, §§ 917, 952; People v. Clark, supra, 50 Cal.3d at p. 618, 268 Cal.Rptr. 399, 789 P.2d 127; Gordon v. Superior Court (1997) *388 55 Cal.App.4th 1546, 1557, 65 Cal.Rptr.2d 53.)
Petitioners assert that the videotape and the photographs are communications within the attorney-client privilege, and rely on a series of cases which address the applicability of the attorney-client privilege and work product rule to photographs. The first case is Holm v. Superior Court (1954) 42 Cal.2d 500, 267 P.2d 1025, in which plaintiff sued defendant city and its bus driver for personal injuries allegedly suffered while a passenger on the city's bus. In the course of the city's investigation, the city's claims investigator obtained a signed statement from plaintiff, the bus driver made written reports to the city setting forth his version of the accident, and the city's "agents" took photographs at the scene of, and immediately following, the accident. (Holm v. Superior Court, supra, 42 Cal.2d at p. 504, 267 P.2d 1025.) The trial court granted plaintiffs discovery motion for inspection of these items, and rejected defendant city's argument the statement, report, and photographs were protected by the attorney-client privilege. (Id. at p. 505, 267 P.2d 1025.)
Holm held plaintiffs signed statement to the city's investigator was not a confidential communication to an attorney because the city's attorney's represented the city rather than plaintiff. (Holm v. Superior Court, supra, 42 Cal.2d at p. 507, 267 P.2d 1025 (hereafter Holm).) As to the bus driver's report and the photographs, Holm applied the following test for disclosure: where a report has a dual purpose, it is privileged if its dominant purpose is transmittal to the attorney in the course of professional employment. (Ibid.) Holm held the report and the photographs were privileged, even though the items were prepared in the regular course of business, because the dominant purpose of collecting the materials was their use in threatened litigation. "Both originated with agents of the city and it is undisputed that they were forwarded in confidence to the defendants' attorneys for use in possible litigation." (Id. at p. 508, 267 P.2d 1025.)
Holm acknowledged there could be a confidential communication between a client and the attorney through the use of an agent. "It follows that where the communication is between corporate employees and is embodied in reports or photographic evidence for the purpose of redelivery to a corporate attorney the privilege attaches if the reports and photographs were created as a means of communicating confidential information to the attorney." (42 Cal.2d at p. 508, 267 P.2d 1025.) Holm further held "there is no valid basis for a distinction between a communication created for transmittal to an attorney to prepare for threatened litigation following particular accidents, and a communication prepared for an identical purpose under standing rules in the case of all accidents involving personal or property injury. Because the scope of the operations of the defendant city's municipal railway is such as to require communications of this nature as a routine matter, it cannot be said that the attorney-client privilege did not attach." (Id. at pp. 508-509, 267 P.2d 1025.)
In Greyhound Corp. v. Superior Court, supra, 56 Cal.2d 355, 15 Cal.Rptr. 90, 364 P.2d 266, the court held that statements of witnesses taken by defense investigators were not within the attorney-client privilege. Greyhound questioned the validity of Holm's holding that photographs transmitted to counsel were within the attorney-client privilege, and determined the work product privilege, as set forth in the federal rule in Hickman, (Hickman v. Taylor, supra, 329 U.S. 495, 67 S.Ct. 385) was not the law of California. (Greyhound Corp. v. Superior Court, supra, 56 Cal.2d at pp. 398-401, 15 Cal.Rptr. 90, 364 P.2d 266.)
In Suezaki v. Superior Court, supra, 58 Cal.2d 166, 23 Cal.Rptr. 368, 373 P.2d 432, plaintiffs sued defendants for personal injuries. Defendants' attorneys hired an investigator to take motion pictures of one *389 of the plaintiffs without his knowledge. During discovery, plaintiffs compelled defendants to disclose the existence of the films, the fact the films had been taken by an independent investigator, and that the investigator delivered the films to defendants' attorney. Plaintiffs moved for production and inspection of the films. Defendants objected and argued the films had been communicated by defendants' investigator to defendants' attorney for confidential use in preparation of the defense. The trial court found good cause for inspection, but found that Holm prevented disclosure of the items. (Suezaki v. Superior Court, supra, 58 Cal.2d at p. 170, 23 Cal.Rptr. 368, 373 P.2d 432 (hereafter Suezaki).)
In Suezaki, the Supreme Court noted Holm had been decided prior to the enactment of California's Discovery Act, and held Holm was not persuasive on any issue of discovery but was only on point as to the issue of privilege. [Suezaki v. Superior Court, supra, 58 Cal.2d at p. 173, 23 Cal.Rptr. 368, 373 P.2d 432.) Suezaki further noted Holm was concerned with the problem of determining whether an employee of a public entity, while gathering information and making a report, stood in the shoes of his corporate employer and was making a confidential communication to the corporate attorney, or was acting as a mere employee gathering information in the regular course of business. Suezaki held Holm's "dominant purpose" theory was devised to determine the capacity in which a public employee was acting for purposes of discovery, and it did not apply to a natural person who communicates with an attorney. (Suezaki supra, 58 Cal.2d at p. 174, 23 Cal.Rptr. 368, 373 P.2d 432.)
Suezaki next reviewed Holm's discussion of the photographs, and concluded that Holm paid "little attention" to the photographs because the litigants addressed their arguments to the plaintiffs written statement and the bus driver's report. (Suezaki supra 58 Cal.2d at p. 175, 23 Cal.Rptr. 368, 373 P.2d 432.) "No other interpretation explains why a photograph of a public street, even if deemed to be a `communication,' was held to represent a `confidential' subject matter." (Ibid.)
"It is apparent, therefore, that the Holm case, insofar as it holds the photograph was privileged, is distinguishable from the ordinary case in which pictures are taken in preparation for litigation. In spite of this distinction, it is apparent that there exists some confusion as to the precise holding of Holm in regard to the privileged nature of the photographs. In the instant case, the trial court was of the opinion that all photographs taken by an investigator and transmitted to an attorney for use on trial are privileged under the rule announced [in Holm]. This view is, perhaps, shared by others. If Holm is susceptible to that interpretation it should be overruled on this point. A picture of a public bus on a public street is not a confidential communication. Therefore, insofar as the Holm case may be interpreted to hold that any photograph taken for the purpose of litigation and transmitted to an attorney is privileged, per se, it is disapproved." (Suezaki supra 58 Cal.2d at p. 176, 23 Cal. Rptr. 368, 373 P.2d 432.)
Suezaki acknowledged that while the trial court therein incorrectly relied on Holm, the photographs were still not subject to discovery if they were privileged for any other reason. Suezaki examined the exact nature of the films to determine whether any other basis for the privilege existed. (Suezaki supra, 58 Cal.2d at p. 176, 23 Cal.Rptr. 368, 373 P.2d 432.)
"It is quite clear that although the investigator, the attorney and his client may have intended the films to be confidential, to be privileged they must constitute a `communication made by the client to [the attorney]' as that phrase is used [in the attorney-client statutory privilege]. The film here involved obviously was not such a `communication.' *390 It is simply a physical object transmitted to the attorney either with or without an accompanying report or letter of transmittal. As already pointed out, transmission alone, even where the parties intend the matter to be confidential, cannot create the privilege if none, in fact, exists." (58 Cal.2d at p. 177, 23 Cal.Rptr. 368, 373 P.2d 432.)
Suezaki acknowledged that such a transmittal did not lose its privileged status simply because it was from the investigator rather than the client, "for there are many situations in which a communication made by an agent for the client is deemed to be the communication of the client for the purpose of determining privilege. The matter is privileged if the agent is required to communicate to the attorney something from the client which the latter is unable to communicate himself, or where the communication can better be transmitted through a specialist. In such case, the subject matter of the communication is either the client himself ... or facts or impressions emanating from the client to the agent and by him transmitted to the attorney. In these cases it is as if the client himself transmitted the material to his attorney. The communication is then privileged because the statute is designed to encourage, and protect, disclosure by the client to his attorney. But that is not the instant case." (Id. at pp. 176-177, 23 Cal.Rptr. 368, 373 P.2d 432.)
Suezaki found the film was not within the attorney-client privilege because it was not a communication from the defendant client to his attorney:
"Here, the film cannot be said to be a communication made by the agent of something the client would have transmitted himself had he been in a position so to do. The films are not a graphic representation of the defendants, their activities, their mental impressions, anything within their knowledge, or of anything owned by them. The films are representations of the plaintiff, not of the defendants. If they can be said to be a `communication' in any sense of the word, they represent an unconscious and unintended `communication' from plaintiff." (58 Cal.2d at p. 177, 23 Cal.Rptr. 368, 373 P.2d 432.)
Suezaki also rejected defendants' argument that the films were privileged as "work product" of their attorney, and held that "simply because the subject matter sought to be discovered is the *work product' of the attorney it is not privileged." (Ibid.) Suezaki noted that the interpretation of work product in light of Hickman v. Taylor, supra, 329 U.S. 495, 67 S.Ct. 385 had not been adopted in California, and rejected defendants' claim of privilege simply based on work product. (Suezaki supra, 58 Cal.2d at p. 178, 23 Cal.Rptr. 368, 373 P.2d 432.)
The interpretation of Holm and Suezaki must be considered in light of the status of the statutory discovery provisions at the time of the decisions. Holm was decided prior to the enactment of the Discovery Act and the statutory work product rule. (Dowden v. Superior Court (1999) 73 Cal. App.4th 126, 130-131, 86 Cal.Rptr.2d 180.) The language of Holm suggested that pictures and other objections were incorporated into "communications" and therefore privileged. (Holm v. Superior Court, supra, 42 Cal.2d at pp. 508-509, 267 P.2d 1025.) Holm has been interpreted as creating a privilege similar to the federal work product rule, but based instead on the attorney-client privilege. (Dowden v. Superior Court, supra, 73 Cal.App.4th at p. 130, 86 Cal.Rptr.2d 180.) "The practical effect of Holm was to protect certain material now considered work product as if it were an attorney-client communication." (Ibid.)
The Supreme Court questioned Holm in Greyhound and Suezaki which were decided after the enactment of the discovery statute. The original version of the discovery statute granted an absolute privilege for certain work product based on the attorney-client privilege. (Dowden v. Superior Court, supra, 73 Cal.App.4th at p. *391 131, 86 Cal.Rptr.2d 180.) Greyhound (Greyhound Corp. v. Superior Court, supra, 56 Cal.2d at pp. 398-401) "questioned the validity of the Holm holding, that photographs transmitted to counsel to assist him in defending an action were within the attorney-client privilege, and determined the work product privilege was not the law of California." (Dowden v. Superior Court, supra, 73 Cal.App.4th at p. 132, 86 Cal.Rptr.2d 180.) Suezaki "took another step to reduce the protection for work product." (Ibid.) "Whereas after Holm certain work product had been absolutely privileged, after Greyhound and Suezaki work product was only one factor to be used by the trial court in the exercise of its discretion in determining whether or not discovery should be granted. [Citation.] ... Therefore, the work product was not protected under Hickman, and its protection was only available where the material sought to be produced fit under the attorney-client privilege umbrella. [Citations.]" (Ibid.)
In response to Holm, Greyhound, and Suezaki, the Discovery Act was amended to create the separate work product rule for materials prepared in anticipation of litigation, based on the need to protect the privacy and the work product of attorneys. (Dowden v. Superior Court, supra, 73 Cal. App.4th 126, 132-133, 86 Cal.Rptr.2d 180; 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 140, p. 401.) The purpose of the proposed amendments was to limit or deny discovery "`when the facts indicate that "one litigant is attempting to take advantage of the other" or that there is `an abusive attempt to "ride free" on the opponent's industry.' [Citation.]'" (Dowden v. Superior Court, supra, 73 Cal.App.4th at p. 133, 86 Cal.Rptr.2d 180, quoting Committee Report-Administration of Justice (1962) 37 State Bar J. 585, 588.) These amendments resulted in the creation of the current work product rule, as stated in Code of Civil Procedure section 2018. (Dowden v. Superior Court, supra, 73 Cal. App.4th at p. 133, 86 Cal.Rptr.2d 180.) As discussed above, Code of Civil Procedure section 2018's stated purpose and the underlying reasons for its creation emphasize the need to limit discovery so that "`the stupid or lazy practitioner may not take undue advantage of his adversary's efforts...."' (Dowden v. Superior Court, supra, 73 Cal.App.4th at p. 133, 86 Cal. Rptr.2d 180, quoting Pruitt, Lawyer's Work Product (1962) 37 State Bar J. 228, 240-241.) Thus, the rules stated in Holm as to the photographs, and overruled in Greyhound and Suezaki have necessarily been incorporated into the work product rule rather than the attorney-client privilege. Petitioners herein do not assert a work product privilege. We explore the area to differentiate work product from attorney-client privilege.
There are several other cases which address the applicability of the attorneyclient privilege to photographs. In Hiott v. Superior Court, supra, 16 Cal.App.4th 712, 20 Cal.Rptr.2d 157, plaintiff was hospitalized after being injured in a slip and fall accident. She was visited by her attorney-brother in the hospital, who decided that he needed to make a record of her statement regarding the accident. Her brother videotaped a conversation between them in which he asked questions in the role as an attorney gathering information for potential litigation. Hiott found the conversation was not an unprotected "`brother-sister talk'" but rather a "`client-lawyer communication.'" The nature of the questions and answers reflected a confidential communication between a client and her attorney and was within the attorney-client privilege. (Id. at p. 718, 20 Cal.Rptr.2d 157.)[7]
In People v. Gillard (1997) 57 Cal. App.4th 136, 66 Cal.Rptr.2d 790, defendant filed a series of false workers' compensation *392 claims and was charged with perjury and fraud. In the course of the criminal case, the prosecution introduced evidence of defendant's previous injury claims, which were unrelated to the charged offenses. In one of the earlier claims, defendant had consulted an attorney, who had sent his investigator to take photographs of defendant's alleged injuries. The attorney determined he could not assist defendant and closed his file. At trial, the attorney's file was admitted as an exhibit over defendant's objections that the photographs were privileged. (Id. at pp. 143, 160-162, 66 Cal.Rptr.2d 790.) Gillard relied on Holm and held the photographs were privileged "[b]ecause these photographs appear to have been taken to convey confidential information from [defendant] to his attorney." (Id. at pp. 162-163, 66 Cal.Rptr.2d 790.) Gillard found that unlike Suezaki, the defense attorney's investigator took the photographs of defendant for the purpose of communications to defendant's attorney. (Id. at p. 163, fn. 17, 66 Cal.Rptr.2d 790.)
Petitioners rely on Holm and Gillard. and assert the videotape and unredacted photographs are protected from disclosure by the attorney-client privilege. Petitioners argue the videotape and photographs were obtained at Magill's direction, for use in the attorney-client relationship, and constitute confidential communications protected by the privilege.
Petitioners' arguments are refuted by the circumstances of the instant case. John Doe retained Magill to investigate his possible involvement in the fatal vehicular accident. Magill employed Stebens, an investigator, to take photographs of a white van and videotape a trailer. Unlike Hiott, the videotape and photographs do not depict an interview of John Doe by either Magill or Stebens about the incident. In contrast to Gillard, the photographs do not depict John Doe, an injury suffered by Doe, or illustrate John Doe pointing out something to be memorialized in the photograph for the attorney's review. John Doe did not take the photographs, direct Stebens to take particular shots, or transmit the photographs to Magill. Doe did not write any notes or statements on the photographs. The photographs simply depict a white van, with a placard written by Stebens reflecting the time and date of the photographs. The videotape similarly depicts a white van and a flatbed trailer, without the presence of any individuals or commentary about the vehicles.[8]
The videotape and unredacted photographs lack any communicative content, and there is nothing in these items which could be interpreted as a confidential communication from John Doe to Magill. Unlike photographs of a client's body (People v. Gillard, supra 57 Cal.App.4th 136, 66 Cal.Rptr.2d 790) which might be considered as some form of communicative conduct, there is nothing in the videotape and photographs which can reasonably be interpreted as a confidential communication between John Doe and Magill, and the items are not independently protected from disclosure by the attorney-client privilege. We thus conclude the videotape and unredacted photographs are not protected by the attorney-client privilege under the circumstances of this case.
*393 Instead, these items are more appropriately classified as work product of the attorney. The videotape and photographs depict evidence collected by the attorney's investigator in the course of his investigation, which were transmitted to Magill for his review. It could be argued that the videotape and photographs constitute "core" work product which would be absolutely protected from disclosure because the investigator obtained the images for Magill to review in order to form his impressions, opinions or conclusions about the case. The problem with such a "core" work product argument, however, is that Magill voluntarily disclosed the photographs to the CHP, and only redacted the license plate number. Such a limited redaction cannot be considered as preserving something within the absolute protection of "core" work product. In addition, Magill repeatedly stated at the trial court hearing that he was not relying on the work product rule to prevent disclosure of the videotape and photographs in the John Doe file.
As such, the videotape and photographs which Magill's investigator took of the van and trailer, and transmitted to Magill for review, depict evidence gathered by Magill's investigator. They are not protected as confidential communications within the attorney-client privilege. They are simply within the conditional or qualified protection of the work product rule and would be subject to either civil or criminal discovery pursuant to either Code of Civil Procedure section 2018, subdivision (b), or Penal Code section 1054.6, without a further showing that the items are protected by another aspect of the attorney-client privilege. (See part III, post.)

III.

THE IDENTITY OF THE ATTORNEY'S CLIENT
Petitioners raise an alternative argument regarding the videotape and photographs in the John Doe file. Petitioners assert these items are still privileged, even if not independently protected by the attorney-client privilege, because disclosure would lead to discovery of the identity of John Doe. Petitioners argue that John Doe retained Magill with the express instructions to protect the confidentiality of his identity. Petitioners contend that disclosure of the videotape and unredacted photographs would reveal the license plate number of the white van, which would lead to the discovery of John Doe's identity. Petitioners assert the district attorney obtained and executed the search warrant with the sole purpose of discovering John Doe's identity to further the criminal investigation of the fatal accident. Petitioners thus argue the identity of an attorney's client is protected by the attorney-client privilege when disclosure of the client's identity would lead to criminal investigation or prosecution for the very matter the client retained the attorney.
In order to resolve these contentions, we must review a series of Ninth Circuit cases based on California law, which have extended the attorney-client privilege to protect the identity of an attorney's client under a set of narrow and unique circumstances.

A. McDonough and Baird

The attorney-client privilege is designed to protect confidential communications between the client and his attorney and does not ordinarily protect the client's identity. (Satterlee v. Bliss (1869) 36 Cal. 489, 507; Brunner v. Superior Court (1959) 51 Cal.2d 616, 618, 335 P.2d 484; Hays v. Wood (1979) 25 Cal.3d 772, 785, 160 Cal.Rptr. 102, 603 P.2d 19.) It is the majority American rule that the identity and the address of an attorney's client is not per se a confidential communication protected by the attorney-client privilege when there is a legitimate need for the court to require such disclosure. (Willis v. Superior Court (1980) 112 Cal.App.3d 277, 291, 169 Cal.Rptr. 301.) "One theory is *394 that the attorney learns the fact before the relationship is established; the other is that whatever communication is involved is not intended to be confidential, because the attorney must openly represent the client in dealings with third persons, and the adverse party is entitled to know who his or her opponent is." (2 Witkin, Cal. Evidence, supra, § 111, p. 367.)
There is a limited exception to this rule in cases wherein known facts concerning an attorney's representation of an anonymous client implicate the client in unlawful activities. (Hays v. Wood, supra, 25 Cal.3d at p. 785, 160 Cal.Rptr. 102, 603 P.2d 19.) If the government already has evidence of the substance of a communication between attorney and client, but seeks the client's identity to link him with some incriminating evidence, the client's identity may be protected by the privilege. (People v. Chapman (1984) 36 Cal.3d 98, 110, 201 Cal.Rptr. 628, 679 P.2d 62.) "Both the California and the federal courts recognize ... that such information may come within the ambit of the privilege when the client's name itself has an independent significance, such that disclosure would uncover client confidences." (Liew v. Breen (9th Cir.1981) 640 F.2d 1046, 1049; People v. Chapman, supra, 36 Cal.3d at p. 110, 201 Cal.Rptr. 628, 679 P.2d 62.)
Therefore, where "disclosure of the client's name might serve to make the client the subject of official investigation or to expose him to criminal or civil liability," the name itself may be protected by the attorney-client privilege. (Hays v. Wood, supra, 25 Cal.3d at p. 785, 160 Cal.Rptr. 102, 603 P.2d 19; People v. Chapman, supra, 36 Cal.3d at p. 110, 201 Cal.Rptr. 628, 679 P.2d 62.) The court's determination of whether a client's name, address, or fee arrangement is a privileged communication depends on an analysis of the facts of the case, and the potential for harm to the client if the identification is compelled. (Willis v. Superior Court, supra, 112 Cal.App.3d at p. 293, 169 Cal. Rptr. 301.) The court must weigh the competing policies of guaranteeing the right of every person to "freely confer with and confide in his attorney in an atmosphere of trust and serenity while on the other hand, protecting `the historically important state interest of facilitating the ascertainment of truth in connection with legal proceedings.' [Citation.]" (Ibid.)
This exception to the general rule has been developed and applied in a series of California and Ninth Circuit cases, starting with Ex Parte McDonough (1915) 170 Cal. 230, 149 P. 566, in which an attorney was employed to represent individuals being investigated for election fraud. At the request of his clients, he appeared for other persons who had been indicted and provided cash bail on their behalf. McDonough held the attorney could not be compelled to testify as to the identity of the client who employed him to defend the accused and furnish the cash bail. The court recognized "the identity of the attorney's client, or the name of the real party in interest, will seldom be a matter that can be held, under the law, to have been communicated in confidence." (Id. at p. 235, 149 P. 566.) Nevertheless, the court concluded that under the circumstances of the case, the attorney-client privilege extended to nondisclosure of the client's identity, when to divulge that name might subject the client to prosecution for a crime against whose prosecution the attorney had been employed to defend him. (Id. at p. 236, 149 P. 566.)
"We cannot escape the conclusion that ... to require [the attorney] to answer any of the questions as to the name of the client who employed him to defend Higgins et al. would be to require him to divulge a confidential communication made to him by a client in the course of his employmenta communication tending to show, and, under the circumstances of this case, material only for the purpose of showing, an acknowledgement of guilt on the part of such client of the very offenses on account of which the attorney had been employed to defend *395 him." (170 Cal. at pp. 236-237, 149 P. 566.)
A series of Ninth Circuit cases followed McDonough and further developed this rule. In Baird v. Koerner (9th Cir. 1960) 279 F.2d 623 (hereafter Baird), several clients engaged an attorney for advice on tax matters. The attorney determined the clients' tax returns were incorrect and the taxes understated. The attorney transmitted a cashier's check to the I.R.S. for the amount he had received, together with a letter instructing the I.R.S. to deposit the money in its fund for unidentified collections. The I.R.S. sought the clients' identities even though no government investigation was pending into their tax liabilities. The attorney refused to answer and invoked the attorney-client privilege. (Id. at pp. 626-627.)
Baird upheld the attorney's assertion of the privilege. "[A] disclosure of the persons employing [the attorney] would disclose the persons paying the tax; the fact of payment indicates clearly what is here specifically admitted, that an additional tax was payable and that the unknown clients owed it.... [¶] ... [¶] ... [Revealing the clients' names] would disclose the `ultimate motive of litigation' which Wigmore says the privilege should protect." (279 F.2d. at p. 630.) Baird further held that if the "identification of the client conveys information which ordinarily would be conceded to be part of the usual privileged communication between attorney and client, then the privilege should extend to such identification" in the absence of other factors, such as the client's commencement of litigation or employment of the attorney with respect to future criminal or fraudulent transactions. (Id. at p. 632, italics added.)
Baird found the nature and extent of the attorney-client privilege should be based on state law, and application of the exception should depend on the circumstances of each case. (Id. at pp. 630, 632.) Baird relied on McDonough and held:
"`The name of the client will be considered privileged where the circumstances of the case are such that the name of the client is material only for the purpose of showing an acknowledgement of guilt on the part of such client of the very offenses on account of which the attorney was employed.'" (Baird, supra, 279 F.2d at p. 633, quoting 97 C.J.S. Witnesses, § 283e, p. 803.)
Baird found the facts were squarely within this exception to the general rule because the I.R.S. was seeking the identity of the attorney's clients to implicate the clients in the crime of tax evasion, for which there was no pending investigation or litigation:
"Here money was received by the government, paid by persons who thereby admitted they had not paid a sufficient amount in income taxes some one or more years in the past. The names of the clients are useful to the government for but one purposeto ascertain which taxpayers think they were delinquent, so that it may check the records for that one year or several years. The volunteer nature of the payment indicates a belief by the taxpayers that more taxes or interest or penalties are due than the sum previously paid, if any. It indicates a feeling of guilt for nonpayment of taxes, though whether it is criminal guilt is undisclosed. But it may well be the link that could form the chain of testimony necessary to convict an individual of a federal crime. Certainly the payment and the feeling of guilt are the reasons the attorney here involved was employedto advise his clients what, under the circumstances, should be done." (279 F.2d at p. 633, fn. omitted.)
Baird concluded the clients' retention of the attorney and remission of the check to the I.R.S. were tantamount to a communication or admission from the clients to the attorney that they had failed to pay a sufficient amount in taxes in the past. (Ibid.)

B. Development of the Baird rule

Subsequent California and Ninth Circuit opinions acknowledged the general rule *396 that the client's identity is not within the attorney-client privilege, but cited Baird for the proposition that "[a] client's identity and the nature of that client's fee arrangements may be privileged where the person invoking the privilege can show that a strong probability exists that disclosure of such information would implicate that client in the very criminal activity for which legal advice was sought." (United States v. Hodge and Zweig (9th Cir.1977) 548 F.2d 1347, 1353; Willis v. Superior Court, supra, 112 Cal.App.3d at p. 291, 169 Cal.Rptr. 301; see also In re Grand Jury Proceedings (Lawson) (9th Cir.1979) 600 F.2d 215, 218; United States v. Sherman (9th Cir.1980) 627 F.2d 189, 191; United States v. Flores (9th Cir.1980) 628 F.2d 521, 526.) These cases also recognize the Baird rule did not apply where the client secured the attorney's representation in furtherance of present, intended, or continuing illegality. (United States v. Hodge and Zweig, supra, 548 F.2d at p. 1354.)
Baird and McDonough have been applied in several California cases. In People v. Sullivan (1969) 271 Cal.App.2d 531, 77 Cal.Rptr. 25, an attorney testified on direct examination that he had obtained a box containing three pistols and certain papers on which defendant's name appeared by presenting a claim check given him by a client for whom he obtained the box. On cross-examination, the attorney was asked for whom he obtained the box, and the attorney refused to respond. (Id. at p. 543, 77 Cal.Rptr. 25.) Sullivan relied on Baird, and held revelation of the client's identity might conceivably connect the client with criminal activity, and the client's identity was protected by the attorney-client privilege. (Id. at p. 545, 77 Cal. Rptr. 25.) "It is certainly conceivable that if [the attorney's] clients believed the box contained $10,000, they were parties to some criminal act with relation either to the claim check itself or the money. Such a sum honestly come by is rarely transmitted in such a fashion." (Ibid.)
In Rosso, Johnson, Rosso & Ebersold v. Superior Court (1987) 191 Cal.App.3d 1514, 237 Cal.Rptr. 242, defendant law firm placed an advertisement directed to women who were injured from using the Dalkon Shield. Plaintiff responded to the advertisement but later sued the firm, alleging the attorneys were responsible for having missed the statute of limitations on her claim against the manufacturer of the device. Plaintiff sought to discover defendants' master list of clients in the Dalkon Shield cases. Rosso acknowledged the general rule that the client's identity is not privileged, but held the list was protected by the attorney-client privilege because the matter was analogous to the doctor-patient privilege cases. Rosso held that disclosure of the clients' names would reveal the nature of their medical problems, which constituted confidential communications, and "this is one of the exceptional cases where the identity of the client should be protected." (Id. at p. 1519, 237 Cal.Rptr. 242.)

C. Limitation of Baird

The Ninth Circuit sought to clarify and limit the Baird rule in another series of cases. In In re Osterhoudt (9th Cir. 1983) 722 F.2d 591, the court reviewed the cases which followed Baird, and concluded Baird had been misstated and misapplied:
"The principle of Baird was not that the privilege applied because the identity of the client was incriminating, but because in the circumstances of the case disclosure of the identity of the client was in substance a disclosure of the confidential communication in the professional relationship between the client and the attorney." (In re Osterhoudt, supra, 722 F.2d at p. 593.)
Osterhoudt set forth the following as the "true principle" of Baird.
"`[T]he authorities are clear that the privilege extends essentially only to the substance of matters communicated to an attorney in professional confidence. Thus the identity of a client, or the fact *397 that a given individual has become a client are matters which an attorney normally may not refuse to disclose, even though the fact of having retained counsel may be used as evidence against the client.... To be sure, there may be circumstances under which the identification of a client may amount to the prejudicial disclosure of a confidential communication, as where the substance of a disclosure has already been revealed but not its source.'" (In re Osterhoudt, supra, 722 F.2d at p. 594, quoting Colton v. United States (2d Cir. 1962) 306 F.2d 633, 637, italics added.)
The Ninth Circuit has continued to recognize the narrow application of the exception stated in Baird and its progeny, but has held the attorney-client privilege only applies in exceptional circumstances in which disclosure of the client's identity "would reveal information that is tantamount to a confidential professional communication." (Tornay v. U.S. (9th Cir. 1988) 840 F.2d 1424, 1428; In re Grand Jury Subpoenas (Hirsch) (9th Cir.1986) 803 F.2d 493, 497-498; U.S. v. Gray (9th Cir.1989) 876 F.2d 1411, 1415; U.S. v. Blackman (9th Cir.1995) 72 F.3d 1418, 1424; Ralls v. U.S. (9th Cir.1995) 52 F.3d 223, 225; In re Grand Jury Subpoena (Horn) (9th Cir.1992) 976 F.2d 1314, 1317.) "In order to qualify for the protection afforded by the attorney-client privilege, information regarding client identity or legal fees must be `in substance a disclosure of the confidential communication in the professional relationship between the client and the attorney.'" (In re Grand Jury Subpoena (Horn), supra, 976 F.2d at p. 1317, quoting In re Grand Jury Subpoena (Osterhoudt), supra, 722 F.2d at p. 593.)
The Baird rule is an extremely narrow one, and otherwise unprotected information does not become privileged merely because that information might provide evidence of a client's wrongdoing. (In re Grand Jury Subpoena (Horn), supra, 976 F.2d at p. 1317.) "The terms `confidential' and `incriminating' are not synonymous. In order to qualify for the protection afforded by the attorney-client privilege, information regarding client identity or legal fees must be `in substance a disclosure of the confidential communication in the professional relationship between the client and the attorney.'" (Ibid., quoting In re Osterhoudt, supra, 722 F.2d at p. 593.)
The Ninth Circuit has also recognized another limited exception when the client's identity is protected by the attorney-client privilege, where disclosure of the client's identity would constitute the "last link" in an existing chain of evidence likely to lead to the client's indictment. (Ralls v. United States, supra, 52 F.3d 223, 227, fn. 1; U.S. v. Blackman, supra, 72 F.3d at p. 1424.) The "last link" doctrine prevents an attorney from disclosing a client's identity if disclosure would be the final step in the chain of evidence to indict or prosecute that client. (Ralls v. United States, supra, 52 F.3d at p. 227, fn. 1.) The Ninth Circuit has recognized the "last link" doctrine as it relates to fee information. (Ibid.) However, the application of the "last link" doctrine has been limited to situations where disclosure of the fee-payer's identity would be tantamount to disclosure of a privileged communication. (Ibid.; United States v. Gray, supra, 876 F.2d at p. 1416; In re Subpoena To Testify Before Grand Jury (Alexiou) (9th Cir. 1994) 39 F.3d 973, 976-77.)
The limited rule developed by the Ninth Circuit in Baird has been accepted by other federal circuits, but only when disclosure of the client's identity implicates a confidential communication. (See, e.g., In re Grand Jury Investigation No. 83-2-35 (6th Cir.1983) 723 F.2d 447, 451-452; Matter of Walsh (7th Cir.1980) 623 F.2d 489, 495; In re Grand Jury Investigation (Tinari) (3rd Cir.1980) 631 F.2d 17, 19.) These circuits, however, have found the Baird rule of confidentiality defeated "through a prima facie showing that the legal representation was secured in furtherance of present or intended continuing *398 illegality, as where the legal representation itself is part of a larger conspiracy." (In re Grand Jury Investigation No. 83-2-35, supra, 723 F.2d at p. 452.)
The Baird rule has also been rejected by some federal circuits. Most notably, the Fourth Circuit has rejected "the notion that a client can protect his identity by hiring an attorney to make a disclosure for him. An individual cannot purchase anonymity by hiring a lawyer to deliver his money or his messages." (In re Grand Jury Subpoena (4th Cir.2000) 204 F.3d 516, 522, fn. 5; see also In re Shargel (2d Cir.1984) 742 F.2d 61, 62-63.)

D. Application of Baird

The following series of federal and state cases provide examples of the applicability of the Baird rule, in light of the unique nature of this case. The decisions of courts of other states, and of other federal circuits, are not binding on this court on matters of California statutory interpretation. (See Forsyth v. Jones (1997) 57 Cal.App.4th 776, 782-783, 67 Cal. Rptr.2d 357; People v. Superior Court (Moore) (1996) 50 Cal.App.4th 1202, 1211, 58 Cal.Rptr.2d 205; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 940-943, pp. 980-985.) Such decisions, however, may be persuasive because the cases address the applicability of the Baird rule, which was derived from this state's evidentiary attorney-client privilege. (People v. Soto (1998) 64 Cal.App.4th 966, 987, 75 Cal.Rptr.2d 605; 9 Witkin, Cal. Procedure, supra, § 940, 980-981.)
In U.S. v. Blackman, supra, 72 F.3d 1418, the I.R.S. served a summons on an attorney who had failed to comply with the statutory requirement of informing the I.R.S. of the names of clients who had paid more than $10,000 in cash for services. The attorney refused to disclose the names of such clients and claimed the clients' names were protected by Baird's extension of the attorney-client privilege. (Id. at p. 1421.)
In Blackman, the Ninth Circuit acknowledged the attorney-client privilege permitted an attorney to refuse to disclose the identity of a client "where disclosure would compromise confidential communications between attorney and client or constitute the `last link' in an existing chain of evidence likely to lead to the client's indictment." (72 F.3d at p. 1424.) Blackman held there was no evidence that any of the attorney's clients who may be implicated in the dispute were currently the subject of ongoing investigation, and the "last link" doctrine did not apply. (Ibid.) "We have repeatedly held that the attorney-client privilege does not apply where disclosure might incriminate the client or fee-payer, but only where it would convey information tantamount to a confidential communication." (Ibid.) Blackman found the attorney failed to establish the clients' transfer of funds constituted a confidential communication, or related in any direct way to the purpose for the attorney was retained. Blackman rejected the attorney's argument that because his receipt of the funds was "`inextricably linked to the legal service his firm was retained to provide,'" the identity of the fee-payers and the services were privileged. (Id. at p. 1425.) "`[T]he correct test [ ] is whether the fee-payer's identity and the fee arrangements are so intertwined with confidential communications that revealing either ... would be tantamount to revealing a privileged communication.'" (Ibid.)
In In re Subpoena To Testify Before Grand Jury (Alexiou), supra, 39 F.3d 973, an attorney deposited money in his law firm bank account, which included a counterfeit $100 bill. The Secret Service asked the attorney for the identity of the client who passed the counterfeit bill. The attorney replied he could not ethically respond to the inquiry because the client's identity was confidential. The attorney explained he represented the client for traffic violations and a misdemeanor assault charge, and the client made no disclosure as to the source of the money. The attorney was subpoenaed to appear before the grand *399 jury and identify the client. He moved to quash the subpoena on grounds of the attorney-client privilege. (Id. at pp. 974-975.) The government asserted that it was important to contact the attorney's client because he could provide information about similar counterfeit bills that had been passed in the area, and denied that identification of the client would be the "last link" in the chain of evidence necessary to indict the client, because the government's counterfeiting case would still require proof that the bill was passed with the knowledge that it was fake and with the intent to defraud. The district court held the client's identity was not a confidential communication. (Id, at p. 975.)
In Alexiou, the Ninth Circuit again acknowledged the Baird rule might operate to prevent the revelation of the client's identity if the disclosure was the last link in the chain of testimony necessary to convict the client of counterfeiting. However, the client's identity was not privileged because the client's knowledge and intent would still have to be proved to establish a counterfeiting conviction. Alexiou speculated the client may have innocently passed a counterfeit bill, and the communication of the client's name and payment were entirely distinct from the matter in which the client sought the lawyer's services. (Id. at p. 976.) "If the client knew the bill was counterfeit, then Mr. Alexiou was the victim of a crime by his client entirely distinct from the matter in which Mr. Alexiou was retained. If the client did not know, then both of them were victims, and the disclosure would not implicate the client at all. Either way, the disclosure would not be the last link in a chain of evidence which would lead to conviction...." (Ibid.)
In Ritt v. Thriving Enterprises (E.D.Pa. 1983) 37 Fed.Rules Serv.2d 1159, plaintiff alleged defendant company violated federal securities law and committed common law fraud arising from the sale of dies and molds. Plaintiff sought discovery of documents related to sales of tools and dies to purchasers other than plaintiff. Defendant company argued the documents were protected by the attorney-client privilege. However, defendant edited the documents to delete the names and addresses of the purported clients. The court found the contested documents pertained to business and accounting discussion or reports on investments. The court acknowledged Baird and noted that "protection of the client name is to be granted where substantive communications have been previously revealed that are by their nature such an integral part of the attorney-client relationship that any subsequent revelation of identity would seriously impinge upon that relationship...." (Id. at p. 1161.) The court concluded defendant failed to demonstrate the documents were of such a nature that revelation of the clients' names and addresses "`would yield substantially probative links'" in an existing chain of inculpatory events or transactions "or have similar significance." (Id. at p. 1162.) Defendant also failed to show the documents "`have as a primary purpose the securing or providing of legal services,' [citation] as opposed to dealing with general business matters as would appear from the face of the documents." (Ibid.)
Matter of Grand Jury Proceedings, Cherney (7th Cir.1990) 898 F.2d 565 involved an attorney who represented a client convicted in a conspiracy-narcotics trial. The client's legal fees were paid by an unknown third party. After the client was convicted, the attorney was subpoenaed to appear before the grand jury and identify the unknown third party who paid the client's fees. The attorney refused to disclose the name and claimed it was protected by the attorney-client privilege. The district court found the name of the fee-payer was privileged because the individual had also consulted the attorney regarding the conspiracy charges, prior to the attorney's representation of the client at the narcotics trial. (Id. at pp. 566-567.)
Cherney held that the name of the anonymous fee payer was protected by Baird's *400 extension of the attorney-client privilege. The anonymous fee-payer not only paid the third party's legal fees, but had also retained and consulted the attorney about his own potential culpability in the narcotics conspiracy.
"The government conceded at oral argument that an attorney-client relationship existed between the fee payer and Cherney prior to Cherney's representation of [the client] and the purpose for which the fee payer sought advice was his involvement in the underlying drug conspiracy. The government argues that, regardless of the formation of this relationship, information concerning the payment of fees simply cannot be considered a confidential communication. In the circumstances of this case, we must disagree. A client's motive for seeking legal advice is undeniably a confidential communication. See, e.g., Matter of Walsh, 623 F.2d at 494 n. 6. Accordingly, the privilege protects an unknown client's identity where its disclosure would reveal a client's motive for seeking legal advice. Tillotson v. Boughner, 350 F.2d 663, 666 (7th Cir. 1965); Matter of Witnesses, 729 F.2d at 493. Moreover, `information of a known client's fees appears far less likely to reveal confidential communications than would the revelation of an unknown client's identity.' Matter of Witnesses, 729 F.2d at 493. In the situation at bar, the fee payer sought legal advice concerning his involvement in the drug conspiracy. Disclosure of the fee payer's identity would necessarily reveal the client's involvement in that crime and thus reveal his motive for seeking legal advice in the first place. The district court found that the client paid [the other client's] legal fees for representation in the very same matter that gave rise to his attorney-client relationship with Cherney. In effect, therefore, disclosure of the client's identity would expose the substance of a confidential communication between the attorney and the client. The government is correct in its argument that disclosure here would incriminate the fee payer in the conspiracy. Incriminating information, however, may be shielded by the privilege where it is an integral part of a confidential communication. The client's identity, in this case, is privileged because its disclosure would be tantamount to revealing the premise of a confidential communication: the very substantive reason that the client sought legal advice in the first place. This is not the typical case where the government seeks disclosure of a known client's general fee structure, which is usually to determine whether the attorney was paid with illicit funds. In that scenario, revelation of the fee information would most likely serve to incriminate the fee payer, but would not risk exposure of a confidential communication." (898 F.2d at p. 568, italics added.)
Cherney acknowledged that invading the attorney-client privilege in such circumstances may allow the government to prosecute more individuals, but will have "a grave effect on our justice system as clients, knowing that their confidential communications may be subject to disclosure, will eventually be less than candid with their attorneys or will consider foregoing legal advice altogether. This cannot be a desired result." (Id. at p. 569.)
Two cases from other states share some similarities with the instant situation. In Dietz v. Doe (1997) 131 Wash.2d 835, 935 P.2d 611, a fatal hit-and-run vehicular accident occurred when a driver made an unsafe turn. A newspaper article reported the unknown driver had retained an attorney in connection with the investigation. The victim's family determined the attorney's identity and filed a civil suit against John Doe, the unknown driver. In the course of pretrial discovery, the family filed a motion to compel the attorney to disclose the name of his client. The family's motion admitted that disclosure of the client's name would have criminal consequences, but asserted that such disclosure *401 would not establish the level of the unknown driver's involvement in the fatal accident. The attorney refused to disclose the client's name, and the trial court found disclosure of the client's identity was precluded by the attorney-client privilege. (Id. at p. 614.)
The Washington Supreme Court noted the majority rule that a client's identity is not privileged. Dietz examined the Ninth Circuit cases, characterized Baird as creating the "legal advice" exception to the majority rule, and adopted Baird to prevent disclosure of a client's identity under particular and narrow circumstances. Dietz adopted an eight-part test set forth in Wigmore:
"(1) The client must have sought legal advice; (2) from the attorney in his or her capacity as an attorney; (3) the communication must have been made in order to obtain legal advice; (4) in confidence: (5) by the client; (6) the client must wish to protect the client's identity; (7) from disclosure; and (8) the protection must not have been waived." (Dietz v. Doe, supra, 935 P.2d at p. 618, citing 8 Wigmore, Evidence, § 2292, 554 (McNaughton rev.1961).)
Dietz held the circumstances indicated that revelation of the client's identity might implicate the content of the client's communication with the attorney. The attorney might not be able to reveal the client's name without simultaneously revealing the client told him he was involved in the fatal accident. "The revelation could unavoidably convey some of the substance of the communication between [the client and the attorney], and thus violate the attorney-client privilege." (Dietz, supra, 935 P.2d at p. 618.) Dietz declined to reach the issue, however, because there was insufficient evidence to establish the reason the client contacted the attorney, and remanded the matter for further proceedings.
D'Alessio v. Gilberg (1994) 617 N.Y.S.2d 484 [205 A.D.2d 8] also involved a similar situation. A fatal hit-and-run accident occurred when an unknown driver struck and killed a pedestrian. The victim's family learned the unknown driver had consulted a particular attorney. The family initiated pre-action discovery to learn the client's identity from the attorney. The trial court upheld the attorney's claim that disclosure of the client's identity was protected by the attorney-client privilege. (617 N.Y.S.2d at pp. 484-485.)
D'Alessio reviewed New York's statutory attorney-client privilege, which prohibits an attorney from disclosing a confidential communication he had with his client in the course of professional employment. (Id. at p. 485.) The situation did not involve an attorney being asked to divulge information for the purpose of preventing a future crime, "for here the client's crime, if there be one, has already been completed [citations]." (Id. at pp. 485-486.) D'Alessio relied on Baird and Cherney, and found the cases were instructive, even though not binding. D'Alessio held the client's identity was a privileged communication:
"... [T]he client consulted the attorney in connection with his or her involvement in a fatal hit-and-run accident. Disclosure of his identity would reveal his possible involvement in a crime in connection with that accident, which is the precise situation for which he sought legal advice. Under these circumstances his or her identity constitutes a confidential communication, the disclosure of which is prohibited by the dictates of the attorney-client privilege." (617 N.Y.S.2d at p. 486.)
D'Alessio acknowledged that application of the privilege may result in concealing the truth and allowing the guilty to escape. "`That is an evil, however, which is considered to be outweighed by the benefit which results to the administration of justice generally' [citations]." D'Alessio concluded the identity of the unknown driver was privileged "insofar as it was communicated confidentially to that individual's attorney." (Ibid.)

*402 E. John Doe's identity

In the instant case, petitioners rely on McDonough and Baird and argue the unredacted photographs of the white van are within the attorney-client privilege. Petitioners note the unredacted photographs reveal the vehicle's license plate number, which would lead to the identity of John Doe, and John Doe's identity is a protected communication within the attorney-client privilege. Petitioners assert that Doe retained Magill for the purpose of representing him as to any matters involving the fatal vehicular accident, and Doe expressly instructed Magill to maintain the confidentiality of his identity. Petitioners thus contend that disclosure of the videotape and unredacted photographs which reveals the license plate number, would lead to the revelation of John Doe's identity and result in the last link leading to criminal investigation or prosecution for the very matter that Doe retained Magill.
Real Party asserts there is nothing in the record to indicate that Doe will be prosecuted for any offense, and the attorney-client privilege would not protect Doe's identity. Real Party argues that disclosure of the vehicle's license plate number "will only establish to whom the van is registered. It will not prove whether the van was involved in the collision or if Magill's client was driving the van at the time of the collision."
Real Party's contentions hereinthat disclosure of the vehicle's license plate number will only establish to whom the van is registered and will not necessarily lead to prosecution of Magill's clientare somewhat disingenuous. In the search warrant affidavit and at the trial court's hearing, the CHP and the district attorney repeatedly asserted that disclosure of the videotape and unredacted photographs was necessary to further the CHP's investigation of the fatal vehicular accident. In addition, the return in the instant matter asserts that disclosure is necessary because the videotape and unredacted photographs are "physical evidence relating to a crime," based on Magill's statements to Officer Shepard that John Doe was driving a white van and blue trailer matching the description of the suspect vehicle at the time and place of the fatal accident.
Real Party's reliance on Magill's statements are sufficient to raise the specter that the underlying purpose of the search warrant was to learn the identity of John Doe because the CHP concluded he was connected to the fatal accident. Officer Shepard's affidavit particularly cited Magill's statement that John Doe had been driving a white van with a blue trailer in the area of the collision at the time of the fatal accident, and Magill thought Doe's white van and trailer were the vehicles for which the CHP was looking. Officer Shepard's affidavit requested seizure of the videotape and unredacted photographs, which were "expected to reveal the license plate number and full description of the vehicles involved in the collision being investigated. Furthermore, the license information will reveal the registered owners) of those vehicles."
The limited rule developed by McDonough, Baird, and Osterhoudt provides the client's identity is protected by the attorney-client privilege when disclosure "would reveal information that is tantamount to a confidential professional communication" or where disclosure would constitute the "last link" in an existing chain of evidence likely to lead to the client's indictment. (Tornay v. United States, supra, 840 F.2d at p. 1428; Ralls v. United States, supra, 52 F.3d at p. 227, fn. 1.) Magill's statements to Officer Shepard were authorized by John Doe in the course of the investigation, but linked Doe to the scene of the fatal hit-and-run accident. John Doe hired Magill with the instructions to keep his identity confidential but to determine if the CHP was looking for his vehicle. Officer Shepard's affidavit clearly reflects that disclosure of Doe's identity could constitute the last link in the existing chain of evidence between Doe and the fatal accident.
*403 At oral argument, petitioner was asked whether his argument regarding the photographs as a "last link" would apply if the client gave the attorney a firearm with a traceable serial number on it. Petitioners' position was consistent with their previous argument that under those circumstances, an item not privileged of itself could acquire privileged character because the police could trace the serial number to the client's identity. However, we find no basis to extend the "last link" analysis so far.
If Magill had been subpoenaed and asked to disclose the identity of John Doe, he would have likely refused to disclose Doe's identity as a confidential communication protected by the attorney-client privilege under the unique and extraordinary circumstances of this case. (See In re Grand Jury Proceedings (Cherney), supra, 898 F.2d at p. 568.) Unlike Baird, Dietz, and D'Alessio, however, Magill was not subpoenaed and ordered to disclose his client's identity. Instead, the search warrant was limited to the seizure of the videotape and the unredacted photographs of the white van. As set forth in section II, ante, the videotape and photographs are not confidential communications protected from disclosure by the attorney-client privilege, but simply conditional work product subject to both criminal and civil discovery. The court did not order Magill to disclose the identity of his client, and the disclosure of the videotape and photographs would not be tantamount to disclosure of a confidential communication. The possibility that such photographs might lead to the revelation of Doe's identity would not be the determinative factor of whether the privilege applies because the rule developed in Baird, and applied in Cherney, Dietz, and D'Alessio, only protects confidential communications. As discussed above, "[t]he terms `confidential' and `incriminating' are not synonymous. In order to qualify for the protection afforded by the attorney-client privilege, information regarding client identity or legal fees must be `in substance a disclosure of the confidential communication in the professional relationship between the client and the attorney.'" (In re Grand, Jury Subpoena (Horn), supra, 976 F.2d at p. 1317, quoting In re Osterhoudt, supra, 722 F.2d at p. 593.)
Therefore, since we have concluded the videotape and unredacted photographs are not communications under the attorney-client privilege, we find no basis to find that they became "communications" simply because they may lead to the discovery of the name of Magill's client. Given our finding that the videotape and photographs are not protected by the attorney-client privilege, we need not reach the People's alternative argument that such items are subject to disclosure because they depict evidence of a crime. (See People v. Superior Court (Fairbank), supra, 192 Cal.App.3d at pp. 34-35, 237 Cal.Rptr. 158.)

IV.

DISCLOSURE OF THE SEARCH WARRANT INVENTORY RECEIPT
In addition to their claims of attorney-client privilege, petitioners raise several issues regarding the manner in which the special master executed the search warrant and seized the John Doe file. Petitioners assert the special master violated the statutory procedures set forth in Penal Code section 1524 and disclosed the contents of the file prior to a judicial determination of their privilege claims, based on the manner in which he dictated the contents of the file to a law enforcement officer for compiling of an inventory receipt. Petitioners further assert Real Party violated the orders of both the trial court and this court to maintain the confidentiality of all materials, pending a final ruling on the privilege claims, by allowing further dissemination of the inventory receipt.
The search warrants in the instant case were issued pursuant to Penal Code section 1524, and the trial court appointed a *404 special master to execute the warrants and maintain the confidentiality of any items which petitioners claimed were privileged. Therefore, resolution of petitioners' contentions require a review of the special master provisions of section 1524.

A. Section 1524

In 1978 and 1979, the Legislature amended Penal Code section 1524 in response to difficult legal questions raised by the use of search warrants for materials claimed to be privileged. (PSC Geothermal Services Co. v. Superior Court (1994) 25 Cal.App.4th 1697, 1706, 31 Cal.Rptr.2d 213.) "In recognition of the valid and sometimes crucial role search warrants serve in the continuing struggle against sophisticated white-collar crime and the basic need to protect privileged material in the possession of attorneys, among others, and by compromising and balancing these strong competing societal interests, the Legislature filled the existing void with procedural protections." (Deukmejian v. Superior Court (1980) 103 Cal.App.3d 253, 258,162 Cal.Rptr. 857.)
When the object of a search warrant is "documentary evidence" in the possession or under the control of an attorney, physician, psychotherapist or clergyman, "who is not reasonably suspected of engaging or having engaged in criminal activity related to the documentary evidence," certain procedures must be followed. (Pen.Code, § 1524, subd. (c); Deukmejian v. Superior Court, supra, 103 Cal.App.3d at pp. 258-259, 162 Cal.Rptr. 857; Gordon v. Superior Court, supra, 55 Cal.App.4th at p. 1551, 65 Cal.Rptr.2d 53.)[9] These procedures include the trial court's appointment of a "special master" to accompany the law enforcement officers serving the warrant. The court shall appoint a special master at the time of the issuance of the search warrant. (Pen.Code, § 1524, subd. (c)(1).)
A "special master" is an attorney who is a member in good standing of the State Bar, and who has been selected from a list of qualified attorneys that is maintained by the State Bar for the purposes of conducting such searches. (Pen.Code, § 1524, subd. (d).) A special master "shall be considered a public employee, and the governmental entity that caused the search warrant to be issued shall be considered the employer of the special master and the applicable public entity ... relating to claims and actions against public entities and public employees." (Pen.Code, § 1524, subd. (d).)
Upon service of the search warrant, the special master shall inform the party being served of the specific items being sought, and that the party shall have the opportunity to provide the items requested. If the party, in the judgment of the special master, fails to provide the items requested, the special master shall conduct a search for the items as provided in the warrant. (Pen.Code, § 1524, subd. (c)(1); Geilim v. Superior Court (1991) 234 Cal.App.3d 166, 172, 285 Cal.Rptr. 602.)
The special master must oversee the search of the premises. (People v. Superior Court (Bauman & Rose), supra, 37 Cal.App.4th at p. 1765, 44 Cal.Rptr.2d 734.) The special master may permit the law enforcement officers serving the warrant to accompany the special master as the master conducts the search. (Pen. Code, § 1524, subd. (e); Geilim v. Superior Court, supra, 234 Cal.App.3d at p. 172, 285 Cal.Rptr. 602.) However, the law enforcement officers who serve the warrant "shall not participate in the search nor shall he or she examine any of the items being searched by the special master except upon agreement of the party upon whom the warrant has been served." (Pen.Code, § 1524, subd. (e).)
If the party being searched asserts a privilege as to any item, or gives some *405 other reason precluding disclosure, the special master must immediately seal the materials, and take them to superior court for a hearing as to the party's claim of privilege. (People v. Superior Court (Bauman & Rose), supra, 37 Cal.App.4th at p. 1765, 44 Cal.Rptr.2d 734; Pen.Code, § 1524, subd. (c)(2).) "Any information obtained by the special master shall be confidential and shall not be divulged except in direct response to inquiry by the court." (Pen.Code, § 1524, subd. (d).)
A hearing must be held within three days of the service of the warrant, or as expeditiously as possible, to resolve the party's assertion of the privilege or any issues which may be raised pursuant to Penal Code section 1538.5. (People v. Superior Court (Bauman & Rose), supra, 37 Cal.App.4th 1757, 1765, 44 Cal.Rptr.2d 734; Pen.Code, § 1524, subd. (c)(2).) The probable cause showing for the search warrant does not obviate the need for an in camera hearing as to whether the attorney-client privilege applies to seized materials. (People v. Superior Court (Bauman & Rose), supra, 37 Cal.App.4th 1757, 1768-1769, 44 Cal.Rptr.2d 734.)
The records which are claimed to be privileged cannot be unsealed and turned over to the investigating agency or the prosecutor until notice is given and a hearing held in superior court, and until all colorable claims of privilege and privacy are decided by the court. (Gordon v. Superior Court, supra, 55 Cal.App.4th at pp. 1553-1554, 1560, 65 Cal.Rptr.2d 53.) Such notice must be given to the party claiming the privilege "so he can protect his own rights of privacy and the privacy and privilege rights of his clients." (Id. at p. 1554, 65 Cal.Rptr.2d 53.)
An order of disclosure may not be made absent judicial examination of the basis for the party's claim of privilege. (Geilim v. Superior Court, supra, 234 Cal. App.3d at p. 172, 285 Cal.Rptr. 602.)
"This provision, along with the requirement that the special master seal all items, simply upon the statement of the party served (§ 1524, subd. (c)(2)), appear designed specifically to prevent disclosure of possibly privileged documents. These provisions become meaningless if the trial court can order disclosure without examination of the items claimed to be privileged, even if on the basis of a search warrant supported by probable cause, which was not subjected to adversarial testing." (Geilim v. Superior Court, supra, 234 Cal.App.3d 166, 172, 285 Cal.Rptr. 602.)
Thus, the trial court must resolve the party's claim of privilege before any type of disclosure is allowed. (Geilim v. Superior Court, supra, 234 Cal.App.3d 166, 173, 285 Cal.Rptr. 602.) The court may conduct an in camera review of the documents in order to evaluate the party's claim of privilege, and such review may be held only in the presence of the party from whom disclosure is sought or the person authorized to claim the privilege. (Id. at pp. 173-174, 285 Cal.Rptr. 602.)
"Upon a colorable claim of privilege, the trial court cannot order the unsealing of seized documents until the validity of the claim is determined." (Geilim v. Superior Court, supra, 234 Cal.App.3d at p. 174, 285 Cal.Rptr. 602.) "If the judge determines that the information is privileged, neither he nor any other person may ever disclose, without the consent of a person authorized to permit disclosure, what was disclosed in the course of the proceedings in chambers." (Ibid.; Evid. Code, § 915, subd. (b); Gordon v. Superior Court, supra, 55 Cal.App.4th at p. 1560, fn. 10, 65 Cal.Rptr.2d 53.)
The special master provisions of Penal Code section 1524 do not apply when a search is conducted of an attorney suspected of criminal activity. (PSC Geothermal Services Co. v. Superior Court, supra, 25 Cal.App.4th at p. 1702, fn. 4, 31 Cal.Rptr.2d 213.) However, a trial court has the authority to conduct an in camera hearing to determine the validity of the *406 assertion of attorney-client privilege by an attorney suspected of criminal activity, notwithstanding the provisions of Penal Code section 1524. (People v. Superior Court (Bauman & Rose), supra, 37 Cal. App.4th at p. 1767, 44 Cal.Rptr.2d 734.) While the prosecutor herein accused Magill of violating Penal Code section 135 by withholding the unredacted photographs, Real Party has never raised any question regarding the applicability of Penal Code section 1524 in the instant proceedings, and the search warrant specifically identified the search was to be conducted pursuant to this provision. (See Geilim v. Superior Court, supra, 234 Cal.App.3d at p. 172, 285 Cal.Rptr. 602.) We shall therefore review the matter pursuant to the provisions of Penal Code section 1524.

B. The special master's compilation of the inventory receipt

Petitioners assert the special master violated Penal Code section 1524 and improperly disclosed the contents of the John Doe file when he dictated the inventory receipt to Officer Curtin, and specifically described the rental documents and the name of the rental company. Petitioners further assert Officer Curtin improperly made copies of the inventory receipt and gave them to the special master and the prosecutor. Petitioners contend these copies should have been turned over when the trial court sealed the entirety of the file pending further review.
As set forth in part II of the factual statement, ante, the trial court herein appointed Steven Mortimer as the special master to execute the search warrants for the residences of Magill and Stebens, and maintain the confidentiality of all seized materials pursuant to Penal Code section 1524. When the special master seized the John Doe file from Stebens's residence, Stebens immediately and repeatedly claimed the entirety of the file was protected from disclosure by the attorney-client privilege. The special master acknowledged Stebens's claim of privilege on behalf of Magill and Doe, sealed the file, and delivered it to the superior court for the appropriate hearing.
Prior to sealing the file, however, the special master reviewed the contents and asked Officer Paul Curtin to assist in compiling an inventory receipt for the contents. The special master dictated aloud each item in the file for Officer Curtin to fill out the inventory receipt. The special master did not disclose John Doe's identity or read the license plate number from the unredacted photographs, but he specially described the series of rental documents listing the name of the rental company, the form number, the name of the insurance documents for the rental vehicle, and the business cards for two specific individuals with the rental company. Stebens repeatedly objected to the special master's conduct of compiling the receipt and reading aloud the file contents to Officer Curtin, but the special master ignored Stebens's objections and the officers refused to let him place a telephone call to Magill for further instruction.
Officer Curtin duly noted each item as described by the special master, and filled out a triplicate inventory receipt. The special master placed the original inventory receipt on the sealed envelope containing the file, and gave a copy to Stebens. However, Officer Curtin kept the other copy of the receipt, and made and disseminated additional copies to the special master and the deputy district attorney.
The manner in which the special master compiled the inventory receipt violated the letter and spirit of the provisions of Penal Code section 1524. The special master was entitled to permit the officers to be present while he conducted the search, but he was specifically prohibited from allowing any officer to examine any of the items being searched, for which Stebens was claiming the attorney-client privilege. (Pen.Code, § 1524, subd. (e).) In addition, "[a]ny information obtained by the special master shall be confidential and shall not be divulged except in direct response *407 to inquiry by the court." (Pen. Code, § 1524, subd. (d).) Once Stebens asserted the file was protected from disclosure by the attorney-client privilege, the special master was the only person authorized to seize and examine the contents prior to delivering the file to the trial court. While he did not disclose John Doe's name to Officer Curtin, he still disclosed the substance of a series of documents by disclosing the name of the rental company, the form number of the contract, the rental insurance policy, and the names of two employees from the rental company.
The special master was clearly aware that petitioners claimed the entire file was within the attorney-client privilege, and he violated the provisions of Penal Code section 1524, subdivisions (c) and (e), by disclosing the substance of the rental documents in the absence of a noticed hearing and ruling from the trial court. The special master could have easily compiled the inventory receipt by assigning a number to each document for purposes of identification rather than disclose material potentially subject to the attorney-client privilege. The special master also violated Penal Code section 1524 by allowing Officer Curtin to retain a copy of the inventory receipt, which directly led to the dissemination of copies to the prosecutor's office. Thus, the special master improperly allowed the search and inventory to be conducted in such a manner as to permit dissemination of material to unauthorized agencies, despite petitioners' repeated objections and claims of privilege, and in the absence of any finding by the court as to the privileged nature of the contents of the file.[10]

C. The Attorney General's dissemination of the inventory receipt

Petitioners further assert the Attorney General violated this court's stay order by filing the inventory receipt as an exhibit to both the informal response and return in the instant mandamus proceeding.
As discussed in part II of the factual statement, ante, petitioners filed a petition for writ of mandamus with this court for review of the trial court's ruling as to the attorney-client privilege. Petitioners also requested an immediate stay order from this court pending resolution of this matter.
On March 28, 2000, this court ordered Real Party to file an informal response, and stayed the trial court's order for disclosure of the videotape and photographs, pending determination of the petition for writ of mandamus or further order of this court. This court also ordered:
"The balance of the seized documents, as well as original and copies of notations made concerning said seized materials shall remain sealed pending further order of this court. Respondents and their agents are order[ed] to maintain the confidentiality of information gleaned from the seized documents pending further order of this court." (Italics added.)
On April 24, 2000, the Attorney General, on behalf of Real Party, filed an informal response to the petition for writ of mandamus, and included as an exhibit the entirety of the inventory receipt with the specific descriptions of the rental company documents. After this court issued the order to show cause, the Attorney General filed the return on June 9, 2000. The return again included the inventory receipt as an exhibit. Thus, the Attorney General took advantage of two occasions to publicly file a document which consisted of "notations made concerning said seized materials," which this court had ordered to be sealed pending further order of the court.
The Attorney General's conduct of including copies of the inventory receipt in publicly filed briefs with this court, clearly violated the express terms of this court's *408 stay order for all notations of the contents of the John Doe file to remain sealed pending further order of this court. Such conduct allowed any party who reviewed the informal response and return to learn that the John Doe file contained a series of documents from a particular rental company. The rest of this court's file, including the exhibits filed with the petition, would have easily led such a party to infer that John Doe had rented either the white van or the blue trailer from that rental company on the day of the fatal vehicular accident. It would have been a short leap to conclude that search warrants or subpoenas for the rental company's records for that day might reveal the identity of John Doe.
We need not speculate whether law enforcement officials or civil attorneys could have connected the trail of publicly-filed evidence and figured out John Doe's identity, for petitioners' reply in the instant mandamus proceeding provides us with the answer. According to petitioners, on March 29, 2000, a rental trailer was seized by law enforcement officers. Magill further declared that in or about April 2000, at least three search warrants and affidavits were drafted and filed with the Madera County Superior Court. The CHP executed the warrants and searched John Doe's residential property and seized John Doe's vehicle. In addition, a civil action was filed and served upon John Doe in Madera County. Magill declared there was no independent source to lead to the searches or the civil suit, aside from confidential information obtained from the sealed file, particularly the rental company notations on the inventory receipt.
The Attorney General has not replied to these allegations. But whether or not law enforcement officials or civil litigants actually obtained and used the inventory receipt is irrelevant in the face of the repeated violations of section 1524, the trial court's order, and this court's stay order committed by the special master, the law enforcement officers, the deputy district attorney, and the Attorney General. Regardless of this court's determination as to the application of the attorney-client privilege to the John Doe file, these parties violated the provisions of section 1524 and failed to maintain the confidentiality of the contents of the file pending a final judicial determination of the application of the privilege. This court's stay order left no doubt that all notations regarding the contents of the John Doe file were to remain sealed pending this court's determination of the privilege issues.

D. Petitioners' requests for sanctions and other relief.

Petitioners request this court to sanction the prosecutor and the special master for their conduct in this case. The special master improperly compiled the inventory receipt by identifying the name of the rental company. The special master compounded this error when he dictated the inventory receipt to a law enforcement officer, and allowed him to retain a copy of the receipt. The law enforcement officer improperly copied the inventory receipt and disseminated it to the district attorney. The trial court failed to recognize and heed Magill's attempt to bring this issue to its attention during the section 1524 hearing, even though Magill objected to the district attorney's possession of the inventory receipt. The entirety of this conduct violated section 1524, which was enacted to prevent such disclosure prior to a judicial evaluation of a party's claim of privilege. However, we decline to impose monetary sanctions for the reasons stated above. (Guthrey v. State of California, supra, 63 Cal.App.4th 1108, 1126-1127, 75 Cal.Rptr.2d 27.)
Petitioners assert the prosecutor also improperly allowed Mr. Eanni, who represented the victims' families, to review the inventory receipt. Petitioners' argument is based on Magill's declaration that he observed Mr. Eanni speaking with the prosecutor and Officer Shepard following the trial court's hearing, and Magill's subsequent *409 receipt of Mr. Eanni's letter requesting an ex parte inspection of John Doe's vehicle. There is nothing in the record, however, which indicates the prosecutor shared the inventory receipt with Mr. Eanni. The majority of the trial court's hearing had been held in public, and Magill's testimony extensively addressed the matters which might have triggered Mr. Eanni's demand for inspection.
Petitioners additionally request this court to intervene in the pending civil litigation filed against John Doe in Madera County. There is nothing in the instant record to reflect Magill represents John Doe in that case. John Doe has not filed a separate petition in the civil proceeding to stay the matter, and there is no evidence that any criminal charges have been filed against John Doe. We therefore decline to intervene in extraneous matters which are not before this court.
Finally, petitioners request this court to impose sanctions against the Attorney General for including the inventory receipt as an exhibit in both the informal response and return filed with this court in the instant mandamus proceeding, in the face of this court's order that the "originals and copies of notations made concerning said seized materials" shall remain sealed pending further order of this court. Such conduct may constitute a contempt violation of this court's order. (Code Civ. Proc., §§ 128, subd. (a)(4), 177, 177.5, 178, 1209, subd. (a) 5.) This court would, in this case, conduct a noticed hearing and provide for briefing prior to any determination of contempt. (Bauguess v. Paine (1978) 22 Cal.3d 626,150 Cal.Rptr. 461, 586 P.2d 942; Seykora v. Superior Court (1991) 232 Cal.App.3d 1075, 1081-1082, 283 Cal.Rptr. 857.)
This court also has the independent authority to assess sanctions against a party or an attorney who commits an "unreasonable infraction" of the Rules of Court in the course of a mandamus proceeding, or fails to comply with an order of this court. (Cal. Rules of court, rule 56.4(b); rule 26(a); rule 227; Jones v. Superior Court (1994) 26 Cal.App.4th 92, 96-97, 31 Cal. Rptr.2d 264.) This court may assess "such penalties, including the withholding or imposing of costs, as the circumstances of the case and the discouragement of like conduct in the future may require." (Alicia T. v. County of Los Angeles (1990) 222 Cal.App.3d 869, 886, 271 Cal.Rptr. 513; Cal. Rules of Court, rule 26(a).) As with contempt, if this court determines that sanctions against Real Party are appropriate for violating the Rules of Court, we would, in this case, conduct a noticed hearing and give the parties the chance to brief the issue, and provide a statement of reasons for the imposition of sanctions. (Cal. Rules of Court, rule 26(e); Guthrey v. State of California, supra, 63 Cal.App.4th at pp. 1126-1127, 75 Cal.Rptr.2d 27; Henry v. Clifford (1995) 32 Cal.App.4th 315, 324, 38 Cal.Rptr.2d 116; In re Marriage of Flaherty (1982) 31 Cal.3d 637, 654, 183 Cal.Rptr. 508, 646 P.2d 179; Banks v. Dominican College (1995) 35 Cal.App.4th 1545,1558, 42 Cal.Rptr.2d 110.)
The Attorney General's decision to publicly file the inventory receipt with this court was ill advised and might have resulted in very severe consequences because the inventory receipt plainly identified the name of the rental company. We note, however, that we have already found the unredacted photographs and the videotape are not protected from disclosure by the attorney-client privilege. As explained in part I of the legal analysis, ante, we have not reached the application of the attorney-client privilege to the rest of the items in the file, including the rental documents, because of the Attorney General's failure to file a separate petition for writ of mandamus. Indeed, it is questionable whether the rental documents are even protected by the attorney-client privilege, based on the circumstances of this case. (See, e.g., Alpha Beta Co. v. Superior Court, supra, 157 Cal.App.3d at pp. 824-825, *410 203 Cal.Rptr. 752; Nation Truck Lines, Inc. v. Nakano Warehouse & Transportation, supra, 6 Cal.App.4th at pp. 1264-1265, 8 Cal.Rptr.2d 467; D.I. Chadbourne, Inc. v. Superior Court, supra, 60 Cal.2d at pp. 732-733, 36 Cal.Rptr. 468, 388 P.2d 700; Wellpoint Health Networks, Inc. v. Superior Court, supra, 59 Cal.App.4th at p. 119, 68 Cal.Rptr.2d 844.) The Attorney General's conduct was inappropriate, but in light of our statements above and the resolution of this case, we decline to reach the issues of whether the Attorney General should be found in contempt or face the imposition of sanctions for publicly filing the inventory receipt with this court. (Guthrey v. State of California, supra, 63 Cal.App.4th at pp. 1126-1127, 75 Cal.Rptr.2d 27.)
However, pursuant to an order filed separately from this opinion, this court has ordered the confidential information revealed in the return and the informal response to be sealed and treated as confidential, based upon this court's previous order of March 28, 2000, and Real Party, the district attorney, and all parties in possession of copies of said pleadings, have been ordered to treat such information as confidential, redact all such information from their copies, and not to disclose such information.

DISPOSITION
The petition for writ of mandate is denied.
HARRIS, J., and LEVY, J., concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] These facts are the only details provided by Real Party concerning the accident which is the underlying subject of the instant dispute. Neither the district attorney nor Real Party submitted any reports or declarations concerning the exact nature or cause of the accident. As will he discussed below, any additional information regarding the accident was provided by petitioner Magill's statements.
[2] Penal Code section 135 states: "Every person who, knowing that any book, paper, record, instrument in writing, or other matter or thing, is about to be produced in evidence upon any trial, inquiry, or investigation whatever, authorized by law, willfully destroys or conceals the same, with intent thereby to prevent it from being produced, is guilty of a misdemeanor."
[3] We will address the propriety of the Attorney General's decision to include this document in a publicly-filed document in part IV of the legal analysis, post.
[4] In his declaration filed in support of the instant petition, Magill explains the circumstances of this exchange. During cross-examination, Magill realized the prosecutor possessed a copy of the inventory receipt which listed the rental company documents and the other contents of the sealed file. Magill states the prosecutor "was waving around a copy" of the receipt, which triggered Magill's comments and objections. Despite Magill's objections, the trial court did not inquire as to why the prosecutor possessed the inventory receipt.
[5] As will be discussed in part II of the legal analysis, post, only the client may waive the attorney-client privilege, and Stebens' statements cannot be considered as a waiver.
[6] Pursuant to an order filed separately from this opinion, this court has ordered the confidential information revealed in the return and the informal response to be sealed and treated as confidential, based upon this court's previous order of March 28, 2000, and Real Party, the district attorney, and all parties in possession of copies of said pleadings, have been ordered to treat such information as confidential, redact all such information from their copies, and not to disclose such information.
[7] On grounds not applicable to the instant case, Hiott further held the client waived the privilege by consenting to disclosure of the unedited videotape during discovery. (Hiott v. Superior Court, supra, 16 Cal.App.4th at pp. 719-720, 20 Cal.Rptr.2d 157.)
[8] In support of a petition for rehearing, Stebens has submitted a new declaration in which he declares that he took the photographs of the vehicle under John Doe's "direction," and the photographs thus constitute privileged communications to Magill. Stebens has previously failed to make such a factual assertion, even though he testified at the trial court's hearing and submitted declarations in the instant mandamus proceeding, and petitioners have not explained their prior failure to present such information to the court. (See, e.g., Rabbins v. Los Angeles Unified School Dist. (1992) 3 Cal.App.4th 313, 317, 4 Cal.Rptr.2d 649; People v. Beeler (1995) 9 Cal.4th 953, 1004, 39 Cal.Rptr.2d 607, 891 P.2d 153.) In any event, we are not called upon to determine whether such conduct, even if it occurred, might have constituted a communication within the meaning of the attorney-client privilege.
[9] As defined in Penal Code section 1524, "documentary evidence" includes documents, photographs, files, films, video recordings, or papers of any type or description. (Pen.Code, § 1524, subd. (f).)
[10] At oral argument, the Attorney General conceded the special master's conduct violated Penal code section 1524, but characterized such misconduct as "harmless error."